# Illinois Official Reports

## Appellate Court

---

### *People v. Washington*, 2016 IL App (1st) 131198

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LUTHER WASHINGTON, Defendant-Appellant. |
| District & No. | First District, Second Division <br> Docket No. 1-13-1198 |
| Filed | September 20, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CR-1885; the Hon. Maura Slattery Boyle, Judge, presiding. |
| Judgment | Affirmed and remanded for resentencing. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Sharifa Rahmany, all of State Appellate Defender's Office, of Chicago, for appellant. <br><br> Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Mary P. Needham, and Jesse B. Guth, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE HYMAN delivered the judgment of the court, with opinion. <br> Justices Pierce and Simon concurred in the judgment and opinion. |

**OPINION**

¶ 1      Defendant Luther Washington, who represented himself at his jury trial, was convicted of murder with a firearm enhancement. At his sentencing hearing, Washington again represented himself. The sentencing court imposed a term of 30 years' incarceration for murder with an additional consecutive 60-year term for the firearm enhancement. This court granted Washington's motion to file a late notice of appeal.

¶ 2      Washington argues he was not properly admonished regarding his right to counsel as required by Illinois Supreme Court Rule 401(a) (eff. July 1, 1984), both before trial and later when he elected to proceed *pro se* for sentencing. Washington also argues he was not fit for trial and the trial court should have ordered a second fitness hearing. The State responds that Washington was found fit for trial at his first evaluation hearing and the trial court was not obligated to *sua sponte* order another fitness hearing. And, the State asserts Washington was properly admonished regarding his right to counsel before trial. The State agrees with Washington, however, that he was not properly admonished when he elected again to proceed *pro se* for sentencing, and this court should remand for a new sentencing hearing.

¶ 3      We affirm Washington's convictions but remand for a new sentencing hearing. The trial court properly admonished Washington before trial when he discharged his attorney and proceeded *pro se*. The trial court appointed a new assistant public defender to represent Washington on posttrial motions, but Washington discharged him. We find the requirements of Rule 401(a) were substantially met, and Washington knowingly and intelligently waived his right to an attorney at trial. In addition, the record supports the trial court's finding that Washington was fit for trial. But, we reverse and remand for resentencing as the "continuing waiver" rule did not apply. Washington requested and received posttrial counsel, and the trial court did not substantially comply with the requirements of Rule 401(a) before accepting Washington's waiver of his right to counsel for the sentencing hearing.

¶ 4                               BACKGROUND

¶ 5      On the night of September 13, 2008, Garfield Rogers was found facedown in an alley behind his house with a gunshot wound to the head. Earlier that day, Rogers and Washington visited Debra Lewis and her children at her home. Lewis, a relative of Washington's, had known Rogers for 35 years. After spending the day at Lewis's home, Rogers and Washington left late in the evening in Washington's car.

¶ 6      Three months later, Washington was arrested in an abandoned building. When arrested, he was carrying the gun that forensics later determined killed Rogers.

¶ 7      Between February 2009 and April 2011, the office of the public defender represented Washington. In October 2010, the trial court *sua sponte* ordered two psychiatric evaluations after Washington's assistant public defender informed the court that Washington questioned whether Rogers' death resulted from a shooting. After the two evaluators reached opposite conclusions, the trial court held a fitness hearing on January 14 and March 9, 2011. Washington's attorney stated for the record that Washington believed he was fit for trial and opposed any finding of unfitness.

¶ 8      At the hearing, Dr. Susan Messina, licensed clinical psychologist at forensic clinical services for the State, testified she evaluated Washington on two separate occasions in October

and November 2010. She diagnosed Washington with "persecutory type delusional disorder" but stated that Washington understood the charges against him and the role of each participant in the trial. She opined, however, that he was unfit to stand trial.

¶ 9 Dr. Nishad Nadkarni, staff psychiatrist, evaluated Washington on December 22, 2010. At the time, Washington was prescribed an antipsychotic medication plus Benadryl for side effects. Washington self-reported a diagnosis of "paranoid schizophrenia" but denied symptoms of mania or a major depressive episode. Dr. Nadkarni said Washington "exhibited no psychiatric or cognitive impairments." Dr. Nadkarni deemed Washington's affect and mood stable; thought process logical; and, in terms of his articulation, at least above average intelligence. Washington was well-focused on the task, and based on his criminal history and reports of behavior in Cermak Health Services, Dr. Nadkarni opined that Washington manifested antisocial personality traits; in other words, he was a sociopath.

¶ 10 Dr. Nadkarni considered Washington fit for trial. Washington demonstrated a "strong understanding" of the charge and a "strong comprehension" of the nature of the proceedings, correctly identified the roles of various courtroom personnel, and displayed the capacity to assist counsel in his defense. Washington expressed frustration with his defense counsel but was logical and rational in reporting his problems communicating with counsel.

¶ 11 On March 9, 2011, the trial court found Washington fit for trial, stating "Mr. Washington is intelligent, functioning, and does not suffer from any mental health issues that renders him unfit." The assistant public defender requested leave to withdraw as counsel, which was denied.

¶ 12 The following month, the trial court *sua sponte* ordered an additional evaluation for sanity. On the next court date, in May, Washington asked to proceed *pro se* but requested the court "allow me to have standby counsel for technicalities to assist me." The trial court informed Washington he was charged with first degree murder, with a sentence "anywhere from a minimum of 20 years" up to life imprisonment. The trial court also told Washington he had a right to counsel and an attorney would be appointed if he could not afford one. After more discussion, Washington requested, and was granted, "one opportunity to speak to [the assistant public defender] before we finalize it." The case was passed and recalled. Washington told the court he "would like to" represent himself.

¶ 13 On June 23, Washington filed a motion for a bill of particulars and a motion requesting the charging document. He also requested standby counsel. The case was continued twice more. On each occasion the trial court stated Washington was present representing himself on a charge of first degree murder. Washington filed multiple motions at each appearance.

¶ 14 On September 20, Dr. Fidel Echevarria, staff psychiatrist with forensic clinical services, examined Washington and reviewed his clinical records. Dr. Echevarria opined that Washington was mentally fit for trial, legally sane at the time of the alleged offense, and understood his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436 (1966)). Echevarria's report noted Washington identified the charge of first degree murder as a felony and he defined felony to mean, "In my case, it's what they call a class M something like 20 to 60 and a little bit more because a gun was involved, possibly up to life." On September 30, based on this report, the trial court, without holding a hearing, found Washington fit for trial.

¶ 15 In October and November, Washington appeared *pro se* and filed multiple motions each time. In November, Washington filed two motions, one requesting "assistance to assist in my *pro se* defense," which was denied. Washington then stated he was "receiving a lot of bias" in

the courtroom and was "not getting any assistance." After a lengthy colloquy, the trial court informed Washington: "We will try this as a bench or a jury sometime in January. Whatever you choose."

¶ 16        In January 2012, Washington stated he had "water in [his] ear" at the previous court date and was unable to hear the rulings on his motions. Washington stated that he wanted to represent himself but also filed another motion for "assistance," which the trial court denied.

¶ 17        Five months later, in May 2012, Washington filed *pro se* a motion for a substitution of judge for cause. Washington argued his motion before Judge Kazmierski and insisted that he wanted an attorney for his case saying: "I am not qualified to fight. I want to gather some evidence and I need someone to help me present it." Washington then accused the trial judge (Judge Slattery Boyle) of not allowing him to subpoena witnesses; he accused the assistant public defender who had been assigned to his case until April 2011 of conducting "a charade." Judge Kazmierski denied the motion and informed Washington that if he could not afford an attorney, Judge Slattery Boyle would appoint a public defender.

¶ 18        Between November 2011 and June 2012, Washington appeared *pro se* at 20 court dates and filed about 100 motions. On August 6, 2012, the trial court denied 12 motions Washington filed *pro se*, including a motion to "exhume the victims' body" and a motion objecting to "being forced to appear in court every five or ten days as a *pro se* litigant."

¶ 19                                                    Trial

¶ 20        Jury selection began on August 14, 2012. Before trial, Washington stated he was not going to participate but that during the trial he wanted to sit in the back of the courtroom. The trial court denied his request. Washington refused to answer when asked if he objected to the State's motion to sever the armed habitual criminal count and motion to exclude witnesses. The court then proceeded to *voir dire*.

¶ 21        Washington introduced himself to the jurors by saying he was not participating in the trial because he was denied "all" due process and that he was "apparently a schizophrenic and I'm not entitled to no experts as written in Ake versus Oklahoma [*sic*]." During the rest of the *voir dire* Washington either did not respond to questions asked of him or announced that he was not participating. Finally he objected "to everything pertaining to this trial."

¶ 22        Washington's opening statement consisted of statements that the deputy sheriffs dragged him into the courtroom because he was protesting participating in the trial, that if the charges were true he would not have been offered a second degree murder plea, and that he did not have a police report saying that Rogers died of a gunshot wound. He again announced he was not "offered" any due process and was not participating in the trial.

¶ 23        The State presented four witnesses who were present at Lewis's house on September 13, 2008. Each testified that Washington and Rogers spent the day playing dominoes and visiting. Rogers left with Washington around 9 p.m. Washington made no objections, and when it was his turn to cross-examine each witness, he stated he was not participating in the trial. At one point he stated "you haven't allowed me a chance to participate—in the adversarial proceedings thus far."

¶ 24        The State called a friend of Washington's, William Friday, who answered almost every question either with the statement "I don't know" or "I don't recall." When the trial court asked Washington if he had cross-examination, he stated, "Your Honor, I'm not participating in these

proceedings." The trial court then recessed until the next day, prompting Washington to comment: "Your [H]onor, for the purposes of the record I object. You've not allowed me to have any of my witnesses. You've not given me any due process. These cuffs are tight. My ankles are bleeding. And I don't know if I'm going to be able to make it."

¶ 25    The next morning, when the court reconvened, Washington told the court outside the presence of the jury that he would not participate in trial and that he "did not ask for a jury trial. I want the record to reflect that as well." The trial court responded:

"You indicated your unwillingness. You said you were not going to plead guilty. I am completely aware of the record and I am going to make the record. For the purpose of this, you have exerted all of your Constitutional Rights, you have supplied the Court with case law, you have maintained your fitness. And the Court is of the belief that your behavior is intentional, you[r] behavior here today is your willingness and your intent to preserve the record for purpose[s] of appellate—appeal. And you have the right not to be a participant. That is completely up to you.

Now, if you would like to be out here and not be disruptive, that's fine, but if you would prefer to sit in back and listen via microphone and waive your right to be out here, that is also your choice. I will leave that up to you."

Washington then stated, "for purposes of the record, I never asked for a jury trial. And if you have me on record asking for one, it's continued obstruction that has been going on all through these proceedings."

¶ 26    The State called former Assistant State's Attorney John McNulty who testified William Friday had signed a written statement that on September 14, 2008, Washington asked him to keep in his apartment a bag that contained a gun. Washington told him he was afraid he would be caught with the gun. Friday refused, but Washington returned two days later and left the bag. Washington arrived a few days later, took the gun out of the bag, and began loading it. Friday protested, and Washington then left with the bag and the gun. Washington declined cross-examination.

¶ 27    An assistant State's Attorney who conducted the grand jury, the Chicago police officer who found the body, a homicide detective, and a CTA investigator testified. Washington declined cross-examination.

¶ 28    After a lunch break, the deputies brought Washington to the courtroom. Washington stated he was not participating in the trial as there was no Chicago police report "saying there was a homicide." While the assistant State's Attorney opened sealed evidence envelopes, Washington was lying on the floor of the courtroom. Washington did not look at any of the evidence, stated he was not participating, and that he did not ask for a jury trial. He then told the court, "You didn't offer me a bench trial."

¶ 29    Dr. Adrienne Segovia, Cook County assistant medical examiner who conducted the autopsy on Rogers, identified the bullet and casing that were recovered during the autopsy. When the assistant State's Attorney brought them to show Washington, he stated "you know that those weren't recovered from his head." The cause of death was a gunshot wound to the head; the manner of death was homicide.

¶ 30    The arresting officer and the crime scene technician both testified. The next day, a subpoena specialist for Washington's cell phone company, an FBI special agent regarding cell

phone data, and an Illinois State Police forensic specialist specializing in firearms identification testified. Washington declined to cross-examine.

¶ 31    The State rested. After some discussion outside the presence of the jury, Washington rested his defense.

¶ 32    The State made its closing argument, and the trial court instructed the jury. After deliberating approximately 2½ hours, the jury returned a verdict of guilty of murder. The jury also found that Washington "personally discharged a firearm that proximately caused the death."

¶ 33                                    Sentencing Hearing

¶ 34    On September 12, 2012, at the beginning of the sentencing hearing, the trial court addressed Washington as follows:

> "Mr. Washington, sir, you have previously been found guilty. I will admonish you again. You do have rights, even in the post sentencing case. You have chosen to represent yourself, which is your right, but at this point, sir, I can appoint an attorney if you cannot afford one to represent you in the sentencing phase of this case, and that attorney again could prepare all motions and/or on your behalf if you so desire. You are entitled to an attorney. I could appoint a Public Defender if you like. I don't have to if you want to continue to represent yourself. Would you like an attorney to be appointed for you, sir?"

Washington requested an attorney to represent him "in this motion for new trial that I have prepared." The trial court appointed the public defender and the cause was then continued, with the trial court telling Washington, "Since you want an attorney, you will get your attorney."

¶ 35    On the next court date two weeks later, the assistant public defender assigned to the case was unable to be in court. The following colloquy occurred:

> "THE COURT: Mr. Washington, you want a lawyer; correct[?]
>
> THE DEFENDANT: Yes.
>
> THE COURT: All motions that are stricken that are filed on 9-18. As you have a request for an attorney, there is only one attorney.
>
> THE DEFENDANT: Then I don't want an attorney. I want to proceed. I want to proceed on these motion[s] that I filed.
>
> THE COURT: No. Once you have requested one, the game plan is over. You have requested one. I am going to bring in [the assistant public defender]. Motion Defendant to next week, October 4, 2012, for attorney. Motion stricken as of 9-18 because he is requesting an attorney.
>
> THE DEFENDANT: I object. I don't want no attorney. I object for the purposes of the attorney.
>
> THE COURT: Overruled."

¶ 36    On October 4, the assistant public defender appeared with Washington. When asked, Washington stated he would "appreciate [assistant public defender] if you can help me with my motion for a retrial. That's what I'm asking for." Washington's motions filed during the case were then tendered to the assistant public defender.

¶ 37    With the assistant public defender appearing, the trial court continued the case four times. In February, Washington filed *pro se* a motion for cocounsel and a second motion alleging ineffective assistance of counsel. The trial court asked Washington whether he wanted to represent himself: "this was done in September. This is a delay tactic by Mr. Washington, either you withdraw your motion, or you represent yourself, or he represents you." Washington answered the trial court's question regarding proceeding *pro se*: "For the purposes of the record, *Edwards vs. Indiana*—I am the architect of the defense."

¶ 38    Because Washington did not answer directly, the trial court adjourned for one day. The next day the assistant public defender appeared and the trial court struck the *pro se* motions. Washington objected. The trial court then set a court date "for post-trial motions and sentencing." Washington objected. The trial court overruled his objection; Washington said, "Did I tell you I wanted you to represent me? Did I tell you that I needed you?" Washington then told the court he was firing the assistant public defender. The trial court stated, "[assistant public defender], you are now fired. You are no longer representing him," and set a date for sentencing. Washington objected, and the trial court overruled his objection. Washington inquired about the motion for a new trial, and the trial court stated it would be heard on the same date as sentencing.

¶ 39    On March 22, 2013, Washington appeared *pro se* and filed several motions. When told to argue his motion for a new trial, he responded: "Your Honor, I'm not qualified to argue the motion. I was going to ask for appointment of counsel other than the Public Defender." The trial court denied this request, ruled on the motions, denied the motion for a new trial, and proceeded to sentencing.

¶ 40    The State presented two victim impact statements from Debra Lewis, one of the witnesses at trial, and from Rogers' sister. The State also cited in aggravation Washington's criminal history of eight prior felony convictions, three of which were gun-related and carried prison terms.

¶ 41    In allocution, Washington stated that the State's sentence recommendation for the gun enhancement finding was in error because the State was "going to waive the gun charge" at the beginning of trial. He also argued (i) there was no police report regarding a cause of death, (ii) the judge was "working for" someone, and (iii) he was diagnosed as paranoid schizophrenic but was not "crazy." In mitigation, Washington stated he had been an "entrepreneur" for "over 30, 40 years" and created jobs with his moving service (Washington was 53 years old at sentencing and had been incarcerated three different times for a total of 8½ years).

¶ 42    Before imposing sentence, the trial court noted that Washington's presentation of motions and how he chose to conduct himself were "strategic in an attempt to impugn or cause error in this case." The trial court remarked that, contrary to his assertions regarding running a business and providing jobs and income for people, Washington "could not have been a productive family man." The trial court then sentenced Washington to consecutive terms of 30 years' incarceration for murder and 60 years for "proximate cause."

¶ 43    The Office of the State Appellate Defender was appointed to represent Washington on appeal.

¶ 44                                    ANALYSIS

¶ 45        Washington first argues that the trial court did not substantially comply with Illinois
Supreme Court Rule 401(a) before permitting him to "twice proceed *pro se*." Washington did
not raise this issue in his posttrial motion. Errors affecting substantial rights may be addressed
on review even if they were not raised in a posttrial motion. *People v. Langley*, 226 Ill. App. 3d
742 (1992). The right to counsel is so fundamental that it should not be "lightly deemed
waived." *People v. Robertson*, 181 Ill. App. 3d 760, 763 (1989). Further, defendant's
substantial rights are affected during the sentencing stage, and defendant has a constitutional
right to counsel. *Id.* Therefore, we will address the merits of this issue.

¶ 46                            Waiver of Right to Counsel

¶ 47        Generally, a criminal defendant must make an "unequivocal" request to represent himself
or herself. *Faretta v. California*, 422 U.S. 806, 833-36 (1975); *People v. Baez*, 241 Ill. 2d 44,
116 (2011). "Just as the right to counsel is fundamental, the right to represent oneself is of
equal dignity." *People v. Ogurek*, 356 Ill. App. 3d 429, 436 (2005) (citing *People v. Simpson*,
204 Ill. 2d 536, 573 (2001)).

¶ 48        For a defendant to invoke the right of self-representation, he or she must "knowingly and
intelligently relinquish the right to counsel." *Baez*, 241 Ill. 2d at 115-16. That is the purpose of
Rule 401(a), to ensure a defendant's waiver is knowing and voluntary. *People v. Haynes*, 174
Ill. 2d 204 (1996). Before permitting waiver of counsel, Rule 401(a) requires the trial court
determine the defendant understands (1) the nature of the charge; (2) the sentence range,
including the penalty to which the defendant may be subjected due to other convictions; and
(3) the right to counsel and to have counsel appointed due to indigency. Ill. S. Ct. R. 401(a)
(eff. July 1, 1984). Strict, technical compliance with Rule 401(a) is not always required;
"[r]ather, substantial compliance will be sufficient to effectuate a valid waiver if the record
indicates that the waiver was made knowingly and voluntarily, and the admonishment the
defendant received did not prejudice his [or her] rights." *Haynes*, 174 Ill. 2d at 236.

¶ 49        When a defendant expresses a desire to proceed without counsel, the defendant is entitled
to be advised of his or her right to the assistance of counsel, as well as the right to
self-representation. *People v. Campbell*, 224 Ill. 2d 80 (2006). For an effective waiver of
counsel, the admonishments must be in substantial compliance with Rule 401(a). *Id.* at 84 (no
substantial compliance where no admonishments made). The admonishments must be
provided when the court learns defendant chooses to waive counsel so that defendant can
consider the decision's potential ramifications. *People v. Langley*, 226 Ill. App. 3d 742, 750
(1992).

¶ 50        On review, the trial court's decision on a defendant's election to represent himself or
herself will be reversed only if the court abused its discretion, which occurs when the court's
ruling is arbitrary and without a logical basis. *People v. Hunt*, 2016 IL App (1st) 132979, ¶ 16
(new trial ordered where trial court denied defendant his constitutional right to
self-representation). Whether the trial court properly admonished defendant presents a
question of law that we review *de novo*. *People v. Pike*, 2016 IL App (1st) 122626, ¶ 114.

¶ 51        Washington argues that the trial court's failure to substantially comply with Rule 401(a)
invalidated his waivers of counsel. Our first inquiry is whether substantial compliance
occurred or not. Recently, we found substantial compliance with the rule based on all of the
admonitions given, the discussions between the trial court and the defendant, and even

"accepting the claim that the trial court should have admonished defendant about the possibility of his Class X status." *People v Maxey*, 2016 IL App (1st) 130698, ¶ 47 (strict compliance with Rule 401(a) not necessary for *pro se* defendant at trial and sentencing).

¶ 52 Further, the supreme court has found substantial compliance in multiple cases in which the defendant was misinformed about the minimum sentence. For example, in *People v. Kidd*, 178 Ill. 2d 92, 114 (1997), the supreme court found substantial compliance by informing defendant of the nature of the charges, explaining the maximum sentence was the death penalty, and advising him of his right to counsel despite incorrect admonishment regarding one of the charges and the minimum sentence. In *Haynes*, 174 Ill. 2d 204, the trial court substantially complied with the requirements of the rule when it informed the defendant of minimum and maximum sentences for a murder charge but not for a lesser burglary charge. *Id.* at 243. In *People v. Coleman*, 129 Ill. 2d 321 (1989), the trial court incorrectly informed the defendant that the minimum sentence was 20 years, rather than natural life. *Id.* at 334. Finally, the supreme court found no prejudice when the defendant was not informed that the minimum sentence was life but rather informed that the maximum sentence was the death penalty. *People v. Johnson*, 119 Ill. 2d 119, 133-34 (1987).

¶ 53 In May 2011, Washington stated he wished to proceed to trial *pro se*. The trial court informed him the charge was first degree murder, with a sentence "anywhere from a minimum of 20 years" up to life imprisonment. The trial court also told Washington he had a right to counsel and an attorney would be appointed if he could not afford one. After more discussion, Washington asked for an opportunity to speak to his public defender. The case was passed and later recalled. Washington then told the court he "would like to" represent himself. Certainly, conferencing with his public defender assisted Washington with considering the "ramifications" of the decision. *Langley*, 226 Ill. App. 3d at 750.

¶ 54 Finding substantial compliance, we turn to the effectiveness of Washington's waiver. A knowing and intelligent waiver requires "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Kidd*, 178 Ill. 2d at 104-05. The waiver of counsel must be clear, unequivocal, and unambiguous. *People v. Burton*, 184 Ill. 2d 1, 21 (1998). The purpose of requiring a clear and unequivocal waiver is to "(1) prevent the defendant from appealing [either] the denial of his right to self-representation or the denial of his right to counsel, and (2) prevent the defendant from manipulating and abusing the system by going back and forth between his request for counsel and his wish to proceed *pro se*." *People v. Mayo*, 198 Ill. 2d 530, 538 (2002).

¶ 55 To determine whether defendant's waiver was clear and unequivocal, a reviewing court looks to the overall context of the proceedings (*Id.* at 538-39), including a defendant's conduct following the request to represent himself or herself. *Burton*, 184 Ill. 2d at 23-24. We consider the entire record in reaching our conclusion. See *People v. Simpson*, 172 Ill. 2d 117, 133 (1996) (direct questioning regarding defendant's schooling provides one possible means to assess defendant's ability to understand nature of right being waived). "The determination of whether there has been an intelligent waiver of the right to counsel, *** depend[s], in each case, upon the particular facts and circumstances of that case, including the background, experience, and conduct of the accused." *Kidd*, 178 Ill. 2d at 105.

¶ 56 After almost three years of pretrial proceedings during which Washington was represented by counsel, the trial court accepted Washington's waiver of his right to counsel. As the State points out, Washington filed *pro se* over 100 motions. With the trial date approaching,

Washington insisted that he did not have discovery and when the trial court closed discovery, Washington moved for a substitution of judge, a somewhat sophisticated maneuver, which was denied. Washington then filed more motions. Jury selection began in August 2012. Washington announced he was not participating and proceeded to do just that. It is evident that the trial judge had ample opportunity in the pretrial proceedings to observe Washington and fully assess his ability to understand the proceedings. The record indicates that Washington was literate, educated, responsive, oriented, and comprehended what was going on. Washington also had an extensive criminal history and demonstrated a familiarity with the judicial process. In the words of the trial judge, Washington "knew what he was doing when he waived his right to counsel and chose to represent himself." See *People v. Ware*, 407 Ill. App. 3d 315, 340-41, 348 (2011) (reviewing court must consider defendant's conduct "as a whole").

¶ 57                                    *Pro Se* Representation at Sentencing

¶ 58     The State agrees with Washington that he should have been admonished again before proceeding to sentencing, and therefore, this court should remand for a new sentencing hearing with proper admonishments. We accept the State's concession.

¶ 59     Generally, once a defendant makes a valid waiver of counsel, that waiver remains in effect throughout later stages of the proceedings, including posttrial stages. *People v. Baker*, 92 Ill. 2d 85, 91-92 (1982). The "continuing waiver" rule has two exceptions: (1) the defendant later requests counsel or (2) other circumstances suggest that the waiver is limited to a particular stage of the proceedings. *People v. Cleveland*, 393 Ill. App. 3d 700 (2009) (defendant's lack of legal assistance and his own ineffective advocacy during this stage of proceedings may have contributed to lengthy sentence).

¶ 60     Circumstances requiring readmonishments before sentencing include lengthy delays between trial stages or a defendant's later request for counsel. *People v. Simpson*, 172 Ill. 2d 117, 138 (1996). In *Cleveland*, the appellate court considered circumstances almost identical to this case. There, the defendant waived his right to counsel during pretrial proceedings and was properly admonished according to Rule 401(a). *Cleveland*, 393 Ill. App. 3d at 702. After defendant was tried and convicted, he requested that counsel be reappointed to assist him in posttrial proceedings. At the posttrial hearing, the defendant once again waived counsel, and the trial court allowed him to represent himself without giving any admonishments. We held that "where a defendant waives counsel, proceeds *pro se*, requests counsel for a distinct stage of the proceedings, receives counsel, and then decides to waive counsel *again*," the trial court must readmonish the defendant. (Emphasis in original.) *Id*. at 712.

¶ 61     At the beginning of the sentencing hearing, the trial court addressed Washington as quoted *supra* ¶ 34. Washington then requested an attorney to represent him "in this motion for new trial that I have prepared." The trial court appointed the public defender and the cause was continued, with the trial court telling Washington, "Since you want an attorney, you will get your attorney."

¶ 62     By asking Washington if he wished to have assistance of counsel, the trial court at least implicitly informed defendant that he had a right to counsel and that the trial court would appoint counsel if he could not afford one, thus satisfying the third admonishment required by the rule. However, as in *Cleveland*, the trial court did not state either the nature of the charges or the minimum and maximum penalties, as required. *Id.* at 709.

¶ 63     The difficulties the trial court faced are evident in the following exchange on the next court date, two weeks later. The assigned attorney was not present, and Washington responded "yes" when asked if he wanted a lawyer but immediately changed his mind when the trial court told him his *pro se* motions were stricken. The trial court continued the hearing for two weeks to have the assistant public defender appear. Washington stated: "I object. I don't want no attorney. I object for the purposes of the attorney." On October 4, the assistant public defender appeared with Washington. When asked, Washington stated he would "appreciate [assistant public defender] if you can help me with my motion for a retrial. That's what I'm asking for." Washington's motions filed during the case were then tendered to the assistant public defender.

¶ 64     On November 15 and December 21, 2012, and January 9, 2013, with an assistant public defender appearing, Washington was granted more continuances. On February 7 Washington filed *pro se* a motion for cocounsel and a second motion alleging ineffective assistance of counsel. The trial court asked Washington whether he wanted to represent himself as follows: "this [trial] was done in September. This is a delay tactic by Mr. Washington, either you withdraw your motion, or you represent yourself, or he represents you." Washington answered the trial court's question regarding proceeding *pro se* with the following: "For the purposes of the record, *Edwards vs. Indiana*—I am the architect of the defense."

¶ 65     At this point, the trial court dismissed Washington's attorney and set a date for a hearing on Washington's motion for a new trial and for sentencing.

¶ 66     Washington was fully informed and vacillated numerous times; the trial court faced an extremely formidable task. But Rule 401(a) admonishments must be provided when the court learns defendant chooses to waive counsel and proceed *pro se* "so that defendant can consider the ramifications of such a decision." *People v. Langley*, 226 Ill. App. 3d 742, 750 (1992) (no admonishments outlined in Rule 401(a) were provided at the sentencing hearing).

¶ 67     At the sentencing hearing, Washington continued to argue his numerous motions while the trial court repeatedly tried to redirect him to mitigating factors for sentencing purposes. At one point the court even suggested he talk about his education, family, and personal history. "Defendant's insistence on disputing the merits of the charge rather than focusing on the relevant sentencing issue once again signifies his ineffectiveness." *Cleveland*, 393 Ill. App. 3d at 712. Finally, Washington stated in mitigation that he was an "entrepreneur" for "over 30, 40 years," creating jobs with his moving service, but Washington was 53 years old at sentencing and had been incarcerated three different times for a total of 8½ years.

¶ 68     Before imposing sentence, the trial court noted that Washington's presentation of motions and how he chose to conduct himself were "strategic in an attempt to impugn or cause error in this case." While the record supports this assessment, we must conclude that Washington was not adequately admonished after he decided to dismiss his posttrial attorney. The continuing waiver rule is voided by a later request for representation. *Cleveland*, 393 Ill. App. 3d at 708-09. Moreover, the trial court's admonishment when Washington waived counsel before trial had occurred almost two years before he pronounced himself "architect" of his own defense. Viewing the record in its entirety, as we must, under the facts of this case, we find the trial court did not substantially comply with Rule 401(a). Therefore, we remand for resentencing.

¶ 69                                     Fitness to Stand Trial

¶ 70     "Due process bars the prosecution of an unfit defendant." *People v. Brown*, 236 Ill. 2d 175, 186 (2010). Illinois law presumes a defendant fit to stand trial or plead and be sentenced. 725 ILCS 5/104-10 (West 2008). A defendant is unfit if, because of a mental or physical condition, he or she is unable to understand the nature and purpose of the proceedings against him or her or unable to assist in his or her defense. *Id.* To be competent to stand trial, the defendant must have a rational as well as a factual understanding of the proceedings against him or her. *People v. Weeks*, 393 Ill. App. 3d 1004, 1009 (2009).

¶ 71     Under section 104-16, a hearing on fitness determines a defendant's (1) "knowledge and understanding of the charge, the proceedings, the consequences of a plea, judgment or sentence, and the functions of the participants in the trial process"; (2) ability to "observe, recollect and relate occurrences, especially those concerning the incidents alleged, and to communicate with counsel"; and (3) "social behavior and abilities; orientation as to time and place; recognition of persons, places and things; and performance of motor processes." 725 ILCS 5/104-16(b) (West 2008). Based on the evidence before it, the court or jury decides the issue of a defendant's fitness to stand trial or to plead. 725 ILCS 5/104-16 (West 2008).

¶ 72     The trial court must order a fitness hearing if a *bona fide* doubt of the defendant's fitness is raised. 725 ILCS 5/104-11(a) (West 2010). The test of a *bona fide* doubt is objective, examining whether facts raise a "real, substantial, and legitimate doubt" regarding the defendant's mental capacity to meaningfully participate in his or her defense. *People v. Eddmonds*, 143 Ill. 2d 501, 518 (1991). Whether a *bona fide* doubt exists is within the discretion of the trial court, which is in the best position to observe the defendant and evaluate his or her conduct. *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 53. A trial court abuses its discretion only where no reasonable person would take the court's view or where its ruling is arbitrary, fanciful, or unreasonable. *Id.*

¶ 73     At the fitness hearing, Dr. Messina concluded Washington had "persecutory type delusional disorder" and opined that he was unfit to stand trial. On the other hand, Dr. Nadkarni opined that Washington was fit to stand trial despite manifesting antisocial personality traits indicating he was a sociopath. According to Dr. Nadkarni, during the evaluation Washington demonstrated a "strong understanding" of the charge and "strong comprehension" of the nature of the proceedings. Washington correctly identified the roles of various courtroom personnel and, although frustrated with his public defender, displayed the capacity to assist counsel in his defense. Dr. Nadkarni believed Washington to be logical and rational in reporting his problems communicating with her.

¶ 74     After the hearing, the trial court found Washington fit for trial. The "quality of the trial court's observation of the defendant" (*People v. Schoreck*, 384 Ill. App. 3d 904, 920 (2008)) constitutes a significant factor.

¶ 75     In *People v. Hanson*, 212 Ill. 2d 212 (2004), the supreme court explained if the trial court is not convinced that a *bona fide* doubt of fitness is raised, it has the discretion under section 104-11(b) to grant the defendant's request for appointment of an expert to aid in that determination. *Id.* at 217; 725 ILCS 5/104-11(b) (West 2000). If, after a fitness examination is completed, the trial court determines that there is *bona fide* doubt, then a fitness hearing would be mandatory under section 104-11(a). *Hanson*, 212 Ill. 2d at 217. Conversely, if "the trial court finds no *bona fide* doubt, no further hearings on the issue of fitness would be necessary." *Id.* In other words, "[t]he mere act of granting a defendant's motion for a fitness examination

- 12 -

cannot, by itself, be construed as a definitive showing that the trial court found a *bona fide* doubt of defendant's fitness." *Id.* at 222. See *People v. Gentry*, 351 Ill. App. 3d 872, 877 (2004) (court's order for fitness examination does not necessarily imply finding of *bona fide* doubt).

¶ 76    The trial court must order a fitness hearing if a *bona fide* doubt of the defendant's fitness is raised. 725 ILCS 5/104-11(a) (West 2010). Relevant factors a trial court may consider in assessing whether a *bona fide* doubt of fitness exists include (i) a defendant's irrational behavior, (ii) demeanor at trial, (iii) prior medical opinions on the defendant's competence, and (iv) any representations by defense counsel on the defendant's competence. *Brown*, 236 Ill. 2d at 186-87. The mere fact that a defendant suffers from mental disturbances or requires psychiatric treatment does not necessarily raise a *bona fide* doubt as to fitness because he or she may be competent to participate at trial even though his or her mind is otherwise unsound. *Eddmonds*, 143 Ill. 2d at 519.

¶ 77    Almost six months after the fitness hearing, the trial court ordered another behavior clinical examination because Washington's defense counsel and the trial court had concerns about his understanding of the charges. Dr. Echevarria reviewed the clinical records and examined Washington. Dr. Echevarria proclaimed Washington mentally fit to stand trial, legally sane at the time of the alleged offense, and cognizant of his *Miranda* rights. Dr. Echevarria's report noted Washington identified the charge of first degree murder as a felony carrying a possible sentence of 20 to 60 years and "because a gun was involved, possibly up to life." Based on this report, the trial court found Washington fit to stand trial. We find no abuse of discretion.

¶ 78    Washington concludes this argument by asking this court to remand his case to the trial court for a determination of whether he was a "gray area" defendant, *i.e.*, fit to stand trial but not fit to represent himself, under the standards established in *Indiana v. Edwards*, 554 U.S. 164, 172 (2008). But *Edwards* "did not hold there was a higher standard of competence requiring an additional inquiry before a trial court permitted a defendant to proceed *pro se*. Rather, *Edwards* simply held that a defendant's right to self-representation was not absolute ***." *People v. Allen*, 401 Ill. App. 3d 840, 851 (2010). That right could be limited if a defendant was not mentally competent to proceed *pro se*, yet was still competent to stand trial represented by counsel. *Id.*

¶ 79    *Edwards* concluded that the Constitution "permits judges to take realistic account" of a defendant's mental capacities. *Edwards*, 554 U.S. at 177. Particularly applicable is the *Edwards* court's declaration that "the trial judge, particularly one such as the trial judge in this case, who presided over one of Edwards' competency hearings and his two trials, will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant." *Id.*

¶ 80    The record does not establish that Washington was delusional or irrational, as he now asserts. Before the trial began and after the jury reached its verdict, Washington vigorously, persistently, and concretely argued his case to the trial court when he wanted to. And his refusal to participate during his jury trial reflects deliberate conduct on his part. We agree with the trial judge that Washington's actions were premeditated and purposeful, albeit misguided. With his vacillating positions, copious pretrial motions, and persistent courtroom chicanery, Washington sought to obstruct an orderly prosecution. When counsel represented him, Washington adamantly insisted he did not need the assistant public defender assigned to his case. After "firing" his public defenders, he requested counsel and then objected to having

- 13 -

counsel. Under these circumstances, we agree with the trial court—Washington resolved to delay the proceedings, obscure the issues, and confound the trial court.

¶ 81      The frequent court dates during the years between Washington's indictment in February 2009 through his sentencing hearing in September 2012, bespeaks the trial court's deep familiarity with Washington's mental state and competency. Washington asks this court to substitute its judgment for that of the well-informed and discerning trial court in a discretionary ruling. Based on the totality of the record, we cannot say that the trial court abused its discretion in finding Washington fit to stand trial and fit to represent himself.

¶ 82      Affirmed and remanded for resentencing.