2020 IL App (1st) 181280-U
No. 1-18-1280
Order filed December 21, 2020

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 3342 |
| | ) | |
| CHARLES JOHNSON, | ) | Honorable |
| | ) | Thaddeus L. Wilson, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court.
Presiding Justice Walker and Justice Pierce concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Johnson's conviction for first degree murder is affirmed over his contention that the trial court improperly admitted his ex-girlfriend's testimony about other crimes he committed. His conviction for being an armed habitual criminal is reversed where the parties agree it was based on an invalid predicate offense. We vacate the trial court's denial of Johnson's motion for a new trial and Johnson's sentence and remand for new posttrial proceedings because the trial court improperly denied Johnson's request to represent himself during those proceedings.

¶ 2    A jury found Charles Johnson guilty of first degree murder, armed habitual criminal, and unlawful use of a weapon by a felon arising out of the shooting death of Lydell Lynch. Johnson raises several claims addressing his convictions and sentence: (i) his armed habitual criminal

conviction should be reversed outright because one of the predicate offenses was invalid, (ii) the trial court erred in allowing his ex-girlfriend to testify about instances of abuse that took place before the shooting and threats Johnson made to her after the shooting, (iii) the trial court erred in denying Johnson's request to represent himself during posttrial proceedings, (iv) the trial court conducted an insufficient inquiry (see *People v. Krankel*, 102 Ill. 2d 181 (1984)) into Johnson's claim that trial counsel was ineffective for not keeping him apprised of his case information, (v) the trial court improperly sentenced him without a complete presentence investigation report, and (vi) his 95-year sentence is excessive in light of his young age (22) at the time of the offense.

¶ 3    The State agrees, as do we, that Johnson's armed habitual criminal conviction was based on an improper predicate offense and cannot stand. We reverse that conviction outright. We disagree, however, with Johnson's evidentiary argument challenging the admission of Raggs's other crimes testimony, and so we affirm Johnson's first degree murder conviction. Finally, we agree that new posttrial proceedings are necessary because the trial court erred in denying Johnson's request to represent himself. We vacate the trial court's denial of Johnson's motion for a new trial and Johnson's sentence and remand for new posttrial proceedings.  Remand obviates the need to rule on Johnson's *Krankel* and sentencing claims.

¶ 4                                    Background

¶ 5    The State charged Charles Johnson with first degree murder and related counts of armed habitual criminal and unlawful use of a weapon by a felon for the shooting death of Lydell Lynch. Before trial began, Johnson's counsel filed a motion *in limine* to bar one of the State's witnesses, Asia Raggs, from testifying that "she was afraid that [Johnson] was going to hurt her, that he constantly beat her, and that she had locked him up for laying hands on her." In response, the State

indicated it intended to introduce evidence of two previous domestic violence incidents between Johnson and Raggs for the purposes of establishing Johnson's identity as the shooter and his motive for the shooting. The State also wanted to introduce evidence of threats Johnson made to Raggs after the offense as "direct admissions of his guilt" and to counteract any impeachment about her failure to initially identify Johnson as the shooter. The trial court denied Johnson's motion and allowed the evidence "on all of [the] grounds" the State proffered.

¶ 6     At a jury trial the State presented four eyewitnesses to Lynch's murder.

¶ 7     Jamal Rey testified that he attended a party at Lynch's apartment where he lived with Loresa Mackey. He arrived at about 8:00 p.m. and saw Johnson leaving the outer apartment door. He did not say anything to Johnson or see where he went. At some point in the evening, Rey left to get cigarettes but, unable to find any, he returned to the apartment where again saw Johnson outside. Johnson asked about a woman named Asia and told Rey his name was "Money." Rey went upstairs to the apartment door and asked Asia if she knew anyone named Money and she said she did not.

¶ 8     Rey heard another partygoer, Dwayne Wooten, ask "who is that?" Rey turned around and saw Johnson about a foot away. Johnson "stuck his arm out over [Rey's] right hand side and shot Lydell" five or six times with a black gun. Rey tried to grab the gun from Johnson; they "started to wrestle and fight down the stairs." Eventually, Rey got the gun away from Johnson and Johnson ran. Rey picked up the gun and gave it to police sometime after they arrived.

¶ 9     Wooten also testified. He and Asia had gone to the liquor store, and when they got back, Asia "made it clear to us that Charles followed her there." According to Wooten, Johnson came into the apartment 10 minutes after Rey had returned to the party. Wooten saw a gun in Johnson's

hand and watched as he shot Lynch four or five times. Wooten also heard the gun go off twice more "in the hallway" when Rey followed Johnson outside.

¶ 10 Mackey, who lived at the apartment with Lynch, testified that people came over at about 5:00 p.m. At around 1:30 a.m., she was fixing her hair in the bathroom when she heard a knock at the door and saw, reflected in the bathroom mirror, the front door open. Mackey's testimony about what happened next is slightly unclear. At one point she testified that she heard four gunshots, jumped in the bathtub, and then saw Johnson by peeking around from behind the bathroom door. On cross-examination, however, she testified that she saw Johnson in the threshold of the front door and only jumped in the bathtub after he started shooting. Mackey also denied, again on cross-examination, that she told police she saw an unknown man leave her apartment.

¶ 11 Asia Raggs testified about her relationship with Johnson and the night of the shooting. She had dated Johnson in 2013 and the relationship was inconsistent. In January 2014, Raggs was staying with a woman named Lithuania Miller. Another man named Theodore lived at the residence as well. Johnson came to the apartment, and an argument broke out. Johnson tried to get inside the apartment and, in a scuffle, pushed Raggs and Theodore down the stairs. Police arrested Johnson, but Raggs did not pursue the incident in court.

¶ 12 A few months later, Johnson and Raggs were back together. Raggs was out on the sidewalk with her bicycle. Johnson came up to her, punched her in the eye, and took her bicycle. Raggs flagged down police, and they arrested Johnson.

¶ 13 After Raggs's testimony about these earlier incidents, the trial court admonished the jury:

"Ladies and gentlemen, evidence has been received that the defendant has

been involved in conduct other than that charged in the indictment in this case. This

- 4 -

evidence has been received on the issue of the defendant's motive and may be considered by you only for that limited purpose. It is for you to determine whether the defendant was involved in that conduct and if so, what weight should be given to this evidence on the issue of motive."

On the night of the shooting, Raggs and Johnson's relationship had ended. When Raggs left work on the day of the shooting, Johnson "popped up," and joined Raggs on the bus until she transferred to the train. Johnson continued to accompany her. After they got off the train, Raggs went to another bus to take to Mackey's house, but Johnson did not follow her there. Raggs got to Mackey's apartment between 4:00 and 5:00 p.m.

¶ 14    Later that night, Rey asked her if she knew somebody named "Money." She said she did not and started walking toward the door of the apartment where she saw Johnson. Raggs started walking away from the door when she heard about seven gunshots. She saw Lynch on the floor and called the police, though she never saw where Johnson or Rey went.

¶ 15    When the police arrived, Raggs admitted that she was not truthful with them and told them she had not seen Johnson because she was scared. She left Chicago, and went to stay with someone she knew in Rock Island, Illinois. While she was there, Johnson called her and she went to meet him in Iowa City. Raggs stayed with Johnson for two or three days. Johnson asked her about the investigation. Johnson "never admitted that he did it" but "wanted [Raggs] to tell that [she] didn't see him there so he won't be placed on the scene." Johnson threatened Raggs and prevented her from leaving the house. He told her that he knew where her mother, sister, nieces, and nephews lived. Raggs eventually made it back to Chicago where she talked to police again and told them the "whole truth."

¶ 16    Officers collected six fired cartridge cases and three fired bullets from the scene. Forensic analysis showed they all came from the gun officers recovered from Rey.

¶ 17    Johnson presented an alibi defense. Rashaun Pope testified that Johnson was at his house throughout the day before the shooting until the morning after the shooting. Ericka Sullivan (who also went by Ericka Johnson) testified that Johnson came to her house the day after the shooting and was there for the rest of the weekend.

¶ 18    Johnson also testified in his own defense. He explained that he was at Pope's house all day and night when the shooting occurred. He went to Sullivan's house the following day. While there, he learned via Facebook that someone had killed Lynch and later discovered that people believed he was responsible. After staying with Sullivan for three days, Johnson left for Iowa City. Raggs met him there but left at some point. Johnson was eventually arrested in Iowa City and transferred to Chicago Police custody.

¶ 19    Johnson denied he went to Lynch's apartment and denied shooting Lynch. He admitted to committing burglaries with Lynch, Wooten, and Rey. When they were successful, they would split the proceeds. Their most recent burglary was three or four days before Lynch's death, and only he and Lynch split the proceeds. Lynch had not offered any of the proceeds to Rey or Wooten.

¶ 20    The jury found Johnson guilty of first degree murder, armed habitual criminal, and unlawful use of a weapon by a felon.

¶ 21    Before hearing argument on Johnson's motion for a new trial, Johnson told the court he was "respectfully denouncing [his] counsel" because he no longer needed her help. Johnson asked to make his arguments on his own because counsel had not discussed any information about his case with him before trial. Johnson had asked to represent himself before trial and the trial court

allowed him to do so. But before trial began, Johnson changed his mind, apologized to the court, and requested counsel be reappointed.

¶ 22    Referring back to Johnson's pretrial attempt at self-representation, the trial court denied his request to proceed *pro se* "because [Johnson] admitted and stated on the record that [he] did not have the ability to represent [him]self." The court noted that, were it not for Johnson's earlier admission, the court would have admonished him and allowed him to proceed *pro se*. The court also concluded Johnson's request was "a delaying tactic because [Johnson] wishe[d] to delay this matter" a month. The trial court then heard argument on Johnson's motion for a new trial, which was denied.

¶ 23    The court sentenced Johnson to 50 years for first degree murder with a mandatory 25-year enhancement for his personal discharge of a firearm causing great bodily harm. The court merged the unlawful use of a weapon by a felon count into the armed habitual criminal count and sentenced Johnson to a consecutive 20 years for the offense of armed habitual criminal. In all, Johnson's sentence was 95 years.

¶ 24                                    Analysis

¶ 25                    Sufficiency of Evidence of Armed Habitual Criminal

¶ 26    We briefly dispose of the claim on which both parties agree. Johnson argues, and the State concedes, that the State failed to prove him guilty of armed habitual criminal because aggravated battery to a peace officer is not a qualifying predicate offense. The State must prove every element of an offense beyond a reasonable doubt, and we review challenges to the sufficiency of the evidence to determine whether, considering all the evidence in a light most favorable to the State,

any rational trier of fact could have found each element proven beyond a reasonable doubt. *People v. Ephraim*, 2018 IL App (1st) 161009, ¶ 9.

¶ 27 To be guilty of armed habitual criminal, a defendant must possess a firearm after having been convicted of two statutorily enumerated felonies. *Id.*, ¶ 10 (citing 720 ILCS 5/24-1.7(a) (West 2012)). We have consistently held that aggravated battery of a peace officer does not constitute a qualifying offense under the armed habitual criminal statute. *Id.*, ¶¶ 14-19 (citing, *e.g. People v. Crosby*, 2017 IL App (1st) 121645, ¶13). We see no basis to depart from this precedent, especially given the State's concession.

¶ 28 The parties disagree on the scope of the remedy. The State argues we need only remand for resentencing on the merged counts of unlawful use of a weapon by a felon. Johnson argues we should also remand for resentencing for first degree murder. We need not resolve this dispute because, for reasons we explain, we vacate the trial court's posttrial rulings and remand for new proceedings on other grounds. Any arguments aimed at Johnson's sentence can be reasserted on remand.

¶ 29                                  Other Crimes Evidence

¶ 30 Johnson challenges two aspects of Asia Raggs's testimony: (i) the trial court erred in allowing her to testify about pre-offense instances of physical abuse on the issue of his motive to kill Lynch, and (ii) the trial court erred in allowing her to testify about post-offense instances of threats to her and her family on the issue of his consciousness of guilt. The State responds that the trial court committed no error and, even if it did, any error was harmless beyond a reasonable doubt. We find the trial court erred in admitting testimony about pre-offense instances of abuse,

but properly admitted testimony about post-offense threats. We ultimately conclude, however, that any error was harmless, and affirm Johnson's conviction for first degree murder.

¶ 31 We note at the outset that Johnson preserved this issue for our review. *E.g. People v. Sebby*, 2017 IL 119445, ¶ 48 (to preserve error for review, defendant must object at trial and reassert error in posttrial motion). Before trial Johnson filed a motion *in limine* arguing that the trial court should not allow the State to elicit testimony about his behavior toward Raggs both pre- and post-offense. He also reasserted the claimed errors in his motion for a new trial. Thus, we review any error to determine whether it was harmless, and the State bears the burden to show, beyond a reasonable doubt, "that the jury verdict would have been the same without the error." *E.g. People v. Thurow*, 203 Ill. 2d 352, 363 (2003). To determine whether error occurred, we review the trial court's admission of evidence for an abuse of discretion. *People v. Pikes*, 2013 IL 115171, ¶ 12.

¶ 32                    *Testimony About Pre-Offense Abuse*

¶ 33 We start where the parties agree. Evidence of uncharged crimes or bad acts is inadmissible to show a defendant's propensity to commit crimes or bad acts generally. *People v. Davis*, 2019 IL App (1st) 160408, ¶ 57. This evidence is admissible, however, to prove other things like intent, *modus operandi*, motive, identity, or absence of mistake. *Id.* Here, the trial court admitted the evidence of Johnson's pre-offense instances of abuse toward Raggs for the purpose of proving his motive to kill Lynch. We must determine only one thing: whether Raggs's testimony was relevant to the issue on which the trial court admitted it. *People v. Knight*, 209 Ill. App. 3d 224, 227 (1999) (connection between other crimes evidence and purported purpose for admission cannot be "too tenuous").

¶ 34    The parties' dispute comes down to a question of semantics, albeit an important one: how capacious is the word "motive." Johnson argues that evidence tending to prove motive would be relevant if it showed his "motive to shoot Lynch." The State takes a broader view, arguing that evidence of Johnson's motive includes his "motive to seek [Raggs] out and do violence" or his "motive to show up at the apartment where [Raggs] was staying to kill her or someone else." We find Johnson's view more persuasive. For other crimes evidence to be probative to the issue of motive it must be probative of the defendant's motive to commit the specific offense with which he or she is charged. Anything else comprises propensity evidence in disguise.

¶ 35    We find support for our conclusion in *People v. Thingvold*, 145 Ill. 2d 441 (1991). There, the defendant was convicted of soliciting the murder of his second wife. *Id.* at 445. At trial the State introduced testimony of three witnesses, one who testified about conversations with the defendant "brainstorming" the murder of his first wife and two who testified about the defendant's previous attempts to solicit the murder of his second wife. *Id.* at 450-52. The State offered the other crimes evidence to help prove the defendant's intent and motive. *Id.* at 453. Our supreme court affirmed the trial court's admission of the evidence relating to the defendant's second wife and reversed its admission of the evidence relating to the defendant's first wife. *Id.* at 453-54.

¶ 36    The court's reasoning applies here. In allowing the evidence about the defendant's solicitations for the murder of his second wife, the court emphasized the defendant's desire to collect insurance money as motivating all three solicitations. *Id.* at 453. The court also focused on the defendant's second wife being the precise target of all three solicitations. *Id.* at 454. Here, contrastingly, Raggs's testimony about the pre-offense instances of abuse had nothing to do with Lynch. Raggs testified that Johnson came to an apartment where she was staying and another man

was present. An argument about an unspecified topic broke out, and Johnson ended up fighting both Raggs and the other man. We know nothing about the reason for Johnson's presence at the apartment. We know nothing about the nature of the argument. And we know nothing about Raggs's relationship with the other man. In short, unlike the prior acts in *Thingvold*, the record contains no information from which we could determine the motive for Johnson's earlier actions. Knowing nothing about the motive for the prior acts, it is impossible to say they are relevant evidence of Johnson's motive for the present offense. See *id.*

¶ 37    Raggs's testimony about the other incidence of Johnson's pre-offense abuse is even less probative. She testified that Johnson approached her on the street, punched her, and stole her bicycle. Again, we know nothing about Johnson's motive for this behavior. Was he attempting to intimidate Raggs? Did he simply want her bicycle? We certainly cannot say. And without more information showing the motive for his actions (*e.g.* the insurance policy in *Thingvold*), we also cannot say how the evidence is relevant to Johnson's motive to shoot Lynch.

¶ 38    We draw these distinctions because the court's reasoning in *Thingvold* strongly suggests that the evidence here must have been probative of Johnson's motive to shoot *Lynch*, not simply to do violence to Raggs or those around her. In barring the admission of the testimony about the defendant's first wife in *Thingvold*, the court reasoned that any ideations about killing the defendant's first wife had no bearing on motive that may have developed to solicit the murder of his second wife. *Id.* at 455. Instead, the court concluded that testimony about the defendant's first wife showed his propensity to commit crime generally. *Id.* at 454. We reach a similar conclusion. Raggs's testimony about Johnson's pre-offense abuse, completely unrelated to Lynch, shows that Johnson had a propensity for violent behavior. Any relationship between Johnson's prior conduct

and his motive to murder Lynch is "too tenuous" to be relevant. *Knight*, 209 Ill. App. 3d at 227. The trial court erred in allowing Raggs to testify about Johnson's acts of abuse toward her committed before Lynch's death.

¶ 39                        *Testimony About Post-Offense Threats*

¶ 40    The trial court did not err, however, in allowing Raggs to testify about the threats Johnson made to her and her family *after* the murder. Other crimes evidence is admissible to show a defendant's consciousness of guilt. *People v. Lindgren*, 79 Ill. 2d 129, 137 (1980). In *Lindgren*, on which Johnson relies, the defendant killed the primary witness's grandfather. *Id.* at 133. After the murder, the defendant took the witness to his ex-wife's house and burned the house down because the ex-wife was not home. *Id.* at 134. The State had admitted evidence of the arson on the theory that the defendant had taken a gun from his ex-wife's home, used it in the murder, and burned down the home to prevent the discovery of the missing firearm. *Id.* 138. For reasons that seem quite plain, our supreme court rejected that theory as absurd and found the defendant's admission about the arson—that he had burned the house down to punish his ex-wife for not being home—was a more rational version of events. *Id.* In other words, the arson had nothing to do with any attempt to conceal evidence or manifest the defendant's consciousness of guilt. *Id.*

¶ 41    We find *Lindgren* distinguishable. Raggs's testimony about Johnson's behavior to her after the murder are relevant to show his consciousness of guilt. Johnson asked Raggs about the progress of the investigation and while he "never admitted that he did it" he did ask Raggs to tell the police that he was not at the apartment so "he won't be placed on the scene." After that, he threatened Raggs and told her he knew where her mom, sister, nieces, and nephews lived. The inferences are far less attenuated than those in *Lindgren*. Johnson's insistence that he not be "placed on the scene"

in conjunction with his attempts to coerce Raggs into creating an alibi are relevant to show his consciousness of guilt. The trial court did not err in admitting testimony about Johnson's post-offense conduct toward Raggs.

¶ 42                                    *Harmlessness*

¶ 43    Having found error in admitting evidence of Johnson's pre-offense violence toward Raggs, we must determine whether the error is harmless. In the context of other crimes evidence, to be harmless, the improperly admitted evidence must not be "a material factor in [the defendant's] conviction such that without the evidence the verdict likely would have been different." *People v. Clark*, 2015 IL App (1st) 131678, ¶ 65. Reversal is unwarranted if the error was unlikely to have influenced the jury. *Id.* We find the error harmless beyond a reasonable doubt.

¶ 44    Three of the State's witnesses—Rey, Wooten, and Mackey—testified that they saw Johnson shoot Lynch. Two of them, Rey and Wooten, later identified Johnson as the shooter in an unchallenged photo array. Johnson points to discrepancies or inconsistences between witness testimony and several purported weaknesses in Rey's testimony. Our review of the record shows that any of these issues were fully aired to the jury in Johnson's closing argument and relate to minor details anyway.

¶ 45    We also note that Raggs's testimony about the instances of prior abuse was brief, spanning three pages of more than 40 pages of testimony. The trial court provided a limiting instruction and the sole mention of the preoffense conduct that we can find in the State's closing argument involved one reference in the opening argument to Raggs's "history with [Johnson]" and one reference in rebuttal to her "extremely toxic, abusive" relationship with Johnson. Because the evidence of Johnson's pre-offense abuse amounts to a minor part of Raggs's testimony and a minor

part of the State's case to the jury, we do not find it likely that the verdict would have been different had the evidence been excluded.

¶ 46                    Self-Representation for Posttrial Motions & Sentencing

¶ 47    Johnson argues the trial court erred by refusing to allow him to represent himself on his motion for a new trial and sentencing. The State responds that the issue is forfeited and, on the merits Johnson's request to proceed *pro se* was untimely, unclear, or dilatory. We agree that the issue is forfeited, but we disagree with the State that the trial court properly denied Johnson's request to proceed *pro se*. The trial court should have admonished Johnson to determine whether his request to represent himself was knowing and voluntary. We vacate the trial court's posttrial judgment (the denial of Johnson's motion for a new trial and Johnson's sentence) and remand for new posttrial proceedings at which Johnson may assert his right to self-representation.

¶ 48    We agree with the State that Johnson forfeited his argument that he should have been allowed to proceed *pro se* for posttrial litigation. To preserve an error for review, a defendant must object at the time of the alleged error and include the error in a postjudgment motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Neither the motion for a new trial nor motion to reconsider sentence mentions the trial court's refusal to allow Johnson to represent himself and so the issue is forfeited. But denial of the right to self-representation is second-prong plain error, and reversal is required if error occurred. *People v. Albea*, 2017 IL App (2d) 150598, ¶ 29.

¶ 49    On the merits, every defendant has the constitutional right to represent themselves at every critical stage of the proceedings. See *People v. Burton*, 184 Ill. 2d 1, 22 (1998) (right to counsel applies at all "critical stages" and can only be denied if waived by defendant). A defendant's waiver of the right to counsel must be "clear and unequivocal, not ambiguous." *Id.* at 21. To

determine whether the defendant has made a knowing and voluntary waiver of counsel, the trial court must substantially comply with the admonishments in Illinois Supreme Court Rule 401(a). *People v. Washington*, 2016 IL App (1st) 131198, ¶ 48. The trial court may deny the right to self-representation in three circumstances: (i) the request comes so late in the proceedings that it would be disruptive, (ii) the defendant has engaged in "serious and obstructionist misconduct," and (iii) after admonishing the defendant under Rule 401(a), the trial court concludes he or she is unable to make a knowing or intelligent waiver of counsel. *People v. Ward*, 208 Ill. App. 3d 1073, 1084 (1991). The defendant's ability to represent himself or herself is not a factor the court can consider. *Id.*

¶ 50    We find Johnson's request was clear and unequivocal. He told the court, "I'm respectfully denouncing my counsel. I don't need her right now. So I can make the arguments on my own." The State relies heavily on Johnson's pretrial decision to first represent himself and then ultimately proceed with counsel as evidence that he was equivocal in his decision to proceed *pro se* posttrial. This is inconsistent with how our courts treat the converse situation—waiver of counsel for trial and the request for counsel posttrial. Ordinarily, when a defendant waives the right to counsel for trial that waiver continues to every subsequent stage of proceedings *unless* the defendant requests counsel. *People v. Cleveland*, 393 Ill. App. 3d 700, 705 (2009), *overruled on other grounds by People v. Jackson*, 2011 IL 110615. We see no reason why the same would not be true in reverse— when a defendant is represented by counsel for trial, that representation continues to every subsequent stage *unless* the defendant requests to proceed *pro se*. Johnson's words were clear and unequivocal where he "denounc[ed]" counsel to "make the arguments on [his] own." Those involved construed his words as a request to represent himself, and we do too.

¶ 51 The State also argues that Johnson's request to represent himself was untimely because it was made on the day of sentencing. We disagree. We count just two continuances between the jury's verdict and the hearing on the motion for a new trial. On February 13, 2018, neither Johnson nor his lead counsel was present and only a place-holder motion for a new trial had been filed. On April 23, 2018, counsel still had not filed her motion for a new trial and needed more time to prepare. Johnson raised his request at the second court date at which he was present after his conviction. We do not find Johnson's request untimely, especially where it was made on the first date where he would have had any opportunity to see the final motion for a new trial and evaluate counsel's arguments on his behalf. *Contra e.g. People v. Merritt*, 2017 IL App (2d) 150219, ¶ 32 (finding request to proceed *pro se* untimely where defendant had tried to get substitute counsel *multiple* times and then waited for day of trial to request self-representation).

¶ 52 The State further argues that Johnson's request to represent himself was a dilatory tactic and part of a pattern of "serious and obstructionist misconduct." Again, we see no support in the record for these characterizations. In *Washington*, on which the State relies, the defendant represented himself at trial then, on the day of sentencing, the defendant requested counsel, which the court appointed and afforded a continuance. *Washington*, 2016 IL App (1st) 131198, ¶ 61. The case continued for at least four more months, with the defendant vacillating several times between proceeding on his own and proceeding with the assistance of counsel. *Id.* Although the trial court ruled that the defendant's behavior constituted a delaying tactic, we nonetheless held the trial court must admonish the defendant about proceeding *pro se* and ascertain whether his waiver of counsel was knowing and voluntary. *Id.*, ¶¶ 64-68.

¶ 53    We confront far less flip-flopping than the court in *Washington*. The State again relies on Johnson's pretrial request to proceed *pro se* and then his change of heart to request counsel before trial began. As we explained, a defendant has the right to request counsel or to represent himself or herself at each critical stage of the proceedings. *Burton*, 184 Ill. 2d at 22. The trial court erred when it relied on pretrial discussions about the assistance of counsel to find that Johnson engaged in *post*trial delay. See *People v. Rainey*, 2019 IL App (1st) 160187, ¶ 78 ("courts generally require a persistent pattern of pretrial misconduct, and not just a single, isolated instance, before denying a defendant the right of self-representation."). This rings especially true where Johnson's behavior before trial does not strike us as particularly dilatory. He requested to represent himself, and then realized he was unprepared for the task. He apologized to the court and asked for his lawyer back. Nothing in the record suggests attempts by Johnson to delay the proceedings, even if we consider Johnson's pretrial behavior as part of the analysis.

¶ 54    The record reveals no basis for the trial court to have denied Johnson's request to represent himself without first ascertaining whether his wavier of counsel was knowing and voluntary under Rule 401(a). We note that the trial court would not have been without recourse had Johnson's self-representation devolved into the outbursts he eventually made throughout the sentencing hearing. *Id.*, ¶¶ 75-76 (judge can deny defendant the right to continue representing themselves when their conduct "is so defiant, disruptive, or disrespectful that it 'threaten[s] to forestall' the proceedings."). Johnson had the right to represent himself in posttrial proceedings and it was second-prong plain error for the trial court to deny that right without proper admonishments. We vacate the trial court's judgment and remand for new posttrial proceedings.

¶ 55　　We express no opinion on Johnson's sentencing or *Krankel* claims as he will have the opportunity to litigate those issues afresh on remand.

¶ 56　　Affirmed in part, reversed in part, and vacated in part.

¶ 57　　Cause remanded.