2024 IL App (1st) 220173-U

No. 1-22-0173

Order filed July 19, 2024

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 13338 |
| | ) | |
| LARRY WOODS, | ) | Honorable |
| | ) | Michele McDowell Pitman, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE ODEN JOHNSON delivered the judgment of the court.
Justices C.A. Walker and Tailor concurred in the judgment.

**ORDER**

¶ 1    *Held*: Trial court properly granted the State's motion for reconsideration of the previously entered new trial order based on ineffective assistance of counsel where defendant failed to establish the prejudice prong of *Strickland*; trial court did not err in preventing defendant's trial counsel from attempting to impeach a State witness with a misdemeanor case; the State did not improperly inflame the jury's passions with statements during closing argument; and defendant is entitled to a new sentencing hearing where the trial court did not substantially comply with the requirements of Illinois Supreme Court Rule 401 (eff. July 1, 1984).

¶ 2    Following a jury trial, defendant Larry Woods was convicted of the June 2012 first degree murder of his 16-year-old daughter while armed with a firearm. After trial, defendant made *pro se* allegations of ineffective assistance of counsel, and posttrial counsel was appointed after a preliminary *Krankel* hearing. Posttrial counsel subsequently filed a motion for new trial alleging ineffective assistance of counsel which the trial court granted. The State subsequently filed a motion for reconsideration of the trial court's order. This motion was also granted, resulting in a vacatur of the order for new trial and reinstatement of the defendant's conviction. Defendant was subsequently sentenced to 62 years' imprisonment.

¶ 3    On appeal, defendant contends that: (1) trial counsel was ineffective for failing to (a) request an adverse inference jury instruction, (b) cross-examine Detective Weeden about more than nine hours of missing video footage that he chose not to preserve, and (c) visit or consult with defendant before trial about his case; (2) the trial court erred in (a) preventing defendant from impeaching Rachel Canevello with her misdemeanor false report to 911 conviction, (b) allowing the State to tell the jury that justice demanded a guilty verdict during closing argument which improperly inflamed the jury's passions, and (c) these errors were not harmless beyond a reasonable doubt; and (3) defendant is entitled to a new sentencing hearing because the trial court failed to re-admonish him pursuant to Supreme Court Rule 401 (eff. July 1, 1984) when he opted to proceed *pro se* during sentencing. For the following reasons, we affirm defendant's convictions and remand for a new sentencing hearing.

¶ 4                                    BACKGROUND

¶ 5    Defendant was charged with the murder of his 16-year-old daughter, Gloria Woods. Defendant and his daughter stayed at the Best Motel and Suites (motel) in Dolton, Illinois between

June 19 and June 20, 2012. Her body was found by motel staff on the morning of June 20, 2012. Defendant's trial commenced on July 25, 2016.

¶ 6 The State's evidence at trial consisted of testimony from Gloria's mother, Danielle Allen; defendant's girlfriend Ieshia Clark; the mother of two of defendant's children, Rachel; several of the motel's employees; several police officers; and stipulations related to Gloria's autopsy and DNA evidence. Defendant was represented at trial by Assistant Public Defender (APD) Tom Justic.

¶ 7 Danielle testified that she last spoke to Gloria, whose nickname was "Poohda," on June 18, 2012. Gloria was visiting defendant and his girlfriend, Ieshia, in Gurnee, where they lived with their children; they were supposed to go to Great America the following day. On June 20, 2012, Danielle got a voicemail from defendant asking if Gloria was with her; she responded that Gloria was with him. Danielle spoke with Ieshia to see if Gloria was with her and later went to the motel to look for Gloria. Danielle testified that she constantly called Gloria and defendant but received no answer; the next time she saw Gloria was at the morgue.

¶ 8 Ieshia testified that she, defendant and their two children lived in Round Lake, Illinois in June 2012. The family had plans to go to Great America on June 19, 2012, and Ieshia was driving a white SUV that her mother rented for her. She testified that she let defendant drive the white SUV and they were all in the south suburbs of Chicago on June 18, 2012; but not all together as Ieshia and her children stayed at her mother's home in Lansing, and defendant and Gloria stayed at his father's home in Dixmoor. Defendant told her that he was taking care of some things and that Gloria wanted her hair braided. The following morning, June 19, 2012, Ieshia spoke with Gloria and headed to Dixmoor to pick her up from defendant's father's home. When she arrived,

Gloria was not there, and Ieshia learned that defendant had already picked her up in the white SUV. Ieshia heard Gloria in the background while she was on the phone with defendant and Gloria indicated that her phone was dead. After dropping her two children off with a sitter in Hazel Crest, Ieshia went home and went ahead to Great America at approximately 9 a.m. or 10 a.m. Defendant and Gloria were supposed to meet her at Great America, and she spoke with defendant several times about when he would arrive. Defendant indicated that he would be on the way once he finished working and Gloria got her hair done. She called him several times during the day, and he indicated that Gloria could not get her hair braided. Ieshia eventually stopped calling him, and she left Great America at approximately 7 p.m. or 8 p.m. She called defendant when she left Great America, and he told her that he was still pretty busy and would take Gloria to Great America another time. After speaking to defendant, Ieshia got a ride to Dixmoor where she met defendant. Gloria was not with him, and he told her that Gloria had been picked up, although he did not say by whom. Ieshia and defendant picked up their children from Hazel Crest and then returned home to Round Lake. Ieshia tried to call Gloria several times but did not get an answer. The next morning, Ieshia unsuccessfully attempted to reach Gloria, before calling Gloria's sister, Diamond, and her mother, Danielle. Danielle stated that she had not picked Gloria up from anywhere, and defendant had left home, heading back to the south suburbs to try and find Gloria. Defendant went to Dixmoor and then back to the motel in Dolton to see if Gloria was there. Ieshia stated that defendant told her that Danielle was supposed to pick her up.

¶ 9    Motel staff also testified for the State: Brenda Lazard, Ladonna Sapp, Mariela Jackson and Nathan Peoples. Peoples worked as the front desk clerk at the motel overnight from June 18 to June 19, 2012. Around midnight on June 19, defendant arrived at the hotel in a white SUV.

Defendant and his uncle completed a registration form for Room 111 and received a keycard at approximately 12:13 a.m. At approximately 1:42 a.m., a woman completed a registration form for Room 106 and received a keycard. Peoples viewed video clips showing the outside of the motel and the night front desk area and confirmed that they were true and accurate recordings.

¶ 10    Lazard testified that she worked at the motel on June 19, 2012. Shortly after 11 a.m., a young lady extended Rooms 106 and 111 for four hours. Later that afternoon but before the four hours' expired, defendant extended Room 111 overnight. She stated that defendant was "acting a bit weird" and when he noticed Lazard looking at him, he stated that he had just smoked marijuana. Another woman came into the office, and he told her that "baby girl was sleeping" and he "just didn't have the heart to wake her up." Lazard viewed the video clip that showed defendant in the office extending the room overnight and stated that it truly and accurately depicted what occurred at 13:51 hours on June 19, 2012.

¶ 11    Jackson testified that she worked at the motel as a housekeeper on June 19, 2012, and was responsible for Room 106. When she went to Room 106, she saw a man and a woman there who said they were thinking of staying another day but were unsure. Jackson previously saw the woman go to Room 111 and a teenaged girl opened the door. Jackson also worked on June 20, 2012, and was responsible for Room 111. When she arrived at the room at approximately 10:44 a.m., she saw the same teenager lying down and thought she was relaxing. But when Jackson opened the door, she "noticed something different." She went to her boss and told her that something was wrong with the girl in Room 111. Jackson described the video clip as true and accurate video footage of what she described.

¶ 12     Sapp testified that she was a new manager at the motel in June 2012. At that time, the motel had a video surveillance system, and she was trained in its operation. The morning of June 20, 2012, she was mopping when one of her employees came in and told her to "come now." They went to Room 111 and Sapp saw a body lying in the bed. She did not enter the room but called out "ma'am" but there was no response. Sapp closed the door, told housekeeping not to enter and called the police. Later, Sapp met with a detective about the surveillance system, along with the owners of the motel. She testified that the system was working correctly during the period of June 18 through June 20, 2012. Sapp and the owners instructed the detectives on how to review the video and make hard copies. She spent approximately four hours with police and one of the owners stayed later than she did. Sapp testified that she reviewed video clips from June 19 through 20, 2012, prior to testifying at trial and they accurately reflected how the front desk appeared, how the front of the motel appeared, and how the outside of Rooms 111, 106, other rooms and the area by the vending machines appeared. She identified the types of keycards used at that time and the registration forms created during check in, which included a copy of the guest's identification.

¶ 13     On cross-examination, Sapp stated that the surveillance system was a series of cameras that ran 24 hours a day. One of the videos that police copied was the hallway which included the outside of Room 111. She stated that there were no cameras inside the rooms and the police requested video for June 18 through June 20, 2012.

¶ 14     Rachel testified that defendant was her children's father. She also stated that she was convicted of retail theft in 2007 and 2013, delivery of a controlled substance in 2008; and possession of a counterfeit credit card in 2013. Rachel testified that defendant picked her up on June 18, 2012, and took her to the motel. When she went to get a room, defendant told her to get

one near his daughter's. Rachel did not know defendant's daughter but knew that her name was "Poohda" and that she was a teenager. Rachel got Room 106, which was a few doors down and on the same side as Room 111. She and defendant went into Room 106, talked and smoked marijuana. The next morning, Rachel went to get breakfast before returning to Room 106 and falling asleep. When she woke up, she went to Room 111 to see if Gloria wanted something to eat and saw defendant inside with his daughter. She and defendant left the room a minute later. Rachel testified that Gloria appeared normal but also stated that she did not know her well. Rachel returned to Room 111 to bring Gloria some snacks at approximately 10 am per the video. She returned to Room 111 again around 11:01 a.m. and defendant was inside with Gloria. Rachel went to Room 111 again at approximately 11:32 a.m., and Gloria appeared okay. Rachel subsequently left the motel in the white SUV to pick up her friend Deena. While in the car, defendant called her, but she had trouble understanding him because he repeatedly yelled that something happened and something was wrong. Defendant asked to come back to the motel; he said that something was wrong with his daughter and that he had hit her, or they had gotten into a dispute, but she was okay. Rachel told him to help his daughter and hung up. Defendant called her back and said that everything was okay. When Rachel and Deena made it back to the motel, defendant was in the lobby getting a new room key. Rachel, Deena and defendant left to go get food from a nearby restaurant and they returned to Room 106. Defendant stated that Gloria needed to get her hair done to go to Great America. Rachel asked defendant if Gloria wanted food and he indicated that Gloria did not like jerk chicken. Rachel never returned to Room 111. She later saw a "blunt object" in the back of defendant's shirt that looked like a gun handle.

¶ 15 On cross-examination, defense counsel attempted to question Rachel about a 2007 obstruction of justice/destroying evidence conviction, but the State's objection was sustained. Rachel confirmed that she was convicted of retail theft and received both probation and jail time. Defense counsel then asked Rachel about a previous conviction for filing a false report to 911, and the State objected. During a sidebar, the State indicated that Rachel received six months' supervision on the 911 case, which the trial court stated was not a conviction, and sustained the objection. Defense counsel again attempted to question Rachel about the obstruction charge, arguing that it was a crime of dishonesty, but the trial court sustained the State's objection on the basis that it was a misdemeanor offense. The trial court indicated that the rest of Rachel's convictions, which included two delivery of a controlled substance convictions, two retail thefts and a counterfeit credit card case, would be allowed. Rachel testified on cross-examination that she first spoke with police on June 20, 2012, was kept at the station overnight, and she thought that she was going to be charged with murder. She stated that she did not tell the police about the phone call from defendant when she spoke with police on June 20, and acknowledged that while at the motel, she smoked marijuana. Rachel also stated that she used marijuana daily.

¶ 16 Several police officers testified to various parts of the investigation into the murder. Officer Kevin Rene arrived at the motel at 11:14 a.m. on June 20, 2012, met with Sapp and Jackson, and entered Room 111 where he saw Gloria's body in the bed and secured the scene. Illinois State Police Sergeant Cary Morin arrived at the motel and was directed to Room 111 at approximately 1:25 p.m. on June 20, 2012. He saw that Gloria had head injuries, saw bloodstains on every wall of the room, blood on the floor, a "defect" in the ceiling, and some holes in the wall. There was an adjoining room (Room 110), but the lock to the connecting door was damaged and could not be

opened. Morin recovered items from Room 111, including metal fragments, broken earrings, teeth, and tooth fragments, a .50 caliber casing from the bed, an HTC cell phone battery and a bullet fragment from the ceiling. Morin photographed the scene and several of the photos were published to the jury. Later on, Morin also obtained fingerprint and DNA samples from defendant, including a buccal swab. He was also responsible for processing the white SUV, from which he recovered a rental agreement in Ieshia's mother's name; a hotel room keycard, earrings which appeared substantially similar to those he recovered from the crime scene, a purse with ID cards for "Gloria Woods," a cell phone missing its back battery cover, and a white t-shirt with blood stains. Additionally, police found blood soaked towels and sheets underneath the bed, on the floor and in the bathroom sink.

¶ 17    Sergeant John Shefcik testified that at 4:45 p.m. on June 20, 2012, he was in the lobby of the motel when the desk clerk indicated "there he is" and directed the officers to a white SUV. Defendant was the passenger, appeared visibly upset, and said, "[w]here is my little girl? I need to see my daughter. You better show me my daughter. I'm going to burn this mother f***er down. She is only a virgin. Why would they do this to her? I demand that you show me my daughter." On cross-examination, Shefcik stated that defendant may have said, "[j]ust tell me she is okay. You mother f***ers better tell me she is okay."

¶ 18    Illinois State Police (ISP) Master Sergeant Rebecca Hooks was qualified as an expert in bloodstain pattern analysis. She did a walkthrough of Room 111 with Morin on June 20, 2012. Hooks stated that, by looking at the size, shape, distribution and appearance of bloodstains, she could determine how they were deposited on the wall. She concluded that all of the patterns of the

bloodstains were consistent with blunt force trauma. Hooks also found blood residue all over the bathroom floor, as well as a bloody handprint and footprint.

¶ 19   Lansing Police Sergeant Chuck Weeden testified that on June 20, 2012, he responded to the motel and was assigned to review surveillance video. Motel staff took him to the hotel laundry room, where surveillance equipment was set up with a monitor. After being instructed on how to use the equipment, Weeden viewed various aspects of the motel from the system and made digital copies of the images. Weeden put the images on a flash drive that he downloaded to his computer and then to individual DVDs. He identified People's Group Exhibit 158A through G as the DVDs he created.

¶ 20   Weeden testified that he specifically viewed the footage of the camera that covered the area outside of Room 111 from check-in through when the maid discovered Gloria's body. He also viewed footage from the hallway, outside stairwell, vending machine, the hallway going into the lobby, the lobby, behind the front desk and lobby counter. While viewing the video footage, Weeden noticed a discrepancy in the timestamp on the screen. He identified People's Group Exhibit 5 as clips of various points of the same surveillance video that he watched and copied onto the thumb drive. Multiple clips were published to the jury. Weeden also testified that he reviewed the videos of the time periods that occurred in between the clips, particularly the camera that showed the outside of Rooms 111 and 106. He stated that other than what was shown in the video, he did not see anyone enter or leave Room 111. Altogether, Weeden spent just over two days reviewing the surveillance footage and making copies. Defense counsel did not cross-examine Weeden.

¶ 21    ISP forensic scientist Lyle Boiken testified that he analyzed DNA evidence in this case. He identified a portion of Gloria's blood standard, a portion of defendant's buccal swab, and all portions of the bloody t-shirt (formerly Lab Exhibits 5(A)-(C)). 5(A) revealed a mixture of at least three people, including a major DNA profile from which defendant could not be excluded. 5(B) revealed Gloria's DNA, and 5(C) also revealed a mix of profiles from at least three people, including another major DNA profile from which defendant could not be excluded.

¶ 22    The parties stipulated to Gloria's autopsy results which revealed that she had multiple lacerations, bruises and a skull fracture on her head, face, nose and ear; Gloria's upper two teeth were torn away from their sockets; she had multiple fractures in the upper and lower jawbone; multiple subgaleal and subarachnoid hemorrhages, brain contusions and multiple skull fractures. Gloria's cause of death was blunt head trauma due to an assault and the manner of death was homicide.

¶ 23    The parties also stipulated that Crime Scene Investigator Peter Watson collected a DNA blood card recovered from Gloria's body at the autopsy, and William Anselme, a forensic scientist with the ISP, an expert in forensic biology, collected a t-shirt from the SUV and detected the presence of blood on the t-shirt.

¶ 24    At the close of the State's evidence, defendant moved for acquittal, which was denied. Defendant stated that he was not testifying and agreed that he was aware that the defense was not presenting any evidence.

¶ 25    During jury deliberations, the jury requested transcripts of all testimony, the coroner's reports, and Gloria's time of death. The jury also requested to have the cell phone in evidence charged to see if there was "date or time information like the last call made." Ultimately, the jury

returned a guilty verdict of first degree murder with an additional finding that defendant was armed with a firearm during the offense.

¶ 26                              Posttrial Proceedings

¶ 27                          1. Defendant's Motion for New Trial

¶ 28    On August 24, 2016, APD Justic filed defendant's motion for new trial. However, on November 18, 2016, defendant indicated in court that he wanted to fire Justic because he had never seen him and wanted to proceed *pro se*. On January 17, 2017, defendant again stated that he wished to proceed *pro se*, and the trial court gave him Rule 401 (eff. July 1, 1984) admonishments. On September 25, 2017, defendant asked for counsel. The trial court held a preliminary *Krankel* inquiry and appointed posttrial counsel for defendant. On November 13, 2017, APD Duchatellier filed a motion for new trial alleging ineffective assistance of counsel. Defendant's motion primarily focused on matters related to the surveillance videos, including trial counsel's failure to question or investigate the time discrepancies in the videos, "missing" footage, and the failure to cross-examine Detective Weeden concerning his editing of the videos. There were no issues raised regarding Rachel's impeachment or improper closing argument.

¶ 29    The hearing was held on June 22, 2018, and defendant testified that trial counsel never met with him or discussed discovery with him; he was unaware that Rachel claimed that he called her and said he hit his daughter until she testified at trial; he wanted to have Rachel's phone records subpoenaed and to admit evidence showing her drug use; he was unaware that a bloody t-shirt was found; he never reviewed the video surveillance footage; he had issues with the inconsistent time stamp footage and alleged that there were chunks of footage missing; trial counsel never investigated the camera system or looked at the video; and he wanted to testify but trial counsel

told him not to. On cross-examination, defendant admitted that trial counsel discussed continuances with him but not the actual "goings on" with discovery; he agreed that Rachel admitted to her drug use and convictions when she testified at trial; acknowledged that other people besides Detective Weeden were shown the video at trial and testified to its accuracy; and admitted that the trial court asked if he wanted to testify, and he stated that he did not.

¶ 30    Defendant's trial counsel (Justic) testified that he received the video in discovery and reviewed the complete video. Justic saw no evidence of manipulation or "blips" or any indication that the video was doctored. He admitted that he did not get an expert to review the video because his trial strategy was to argue that the video, while damaging, only showed the outside of Room 111, not the inside and that the jury could not guess what happened inside of the room. Justic sought to exclude the video based on a lack of foundation and he objected to its admission. He did not feel that expert review of the video was warranted based on his trial strategy. Justic said that he also reviewed the clipped edited version of the video and explained it to defendant but did not show it to him. He questioned the State's witnesses about the time discrepancies in the video and stated that he was not present when Detective Weeden downloaded the video and was unaware if any of the video was missing. Justic did not have anyone examine the hotel's video recorder or system. He agreed that the video evidence was important but stressed that he did not believe an expert was necessary based on his viewing of the video. Justic denied that the video showed any suspicious activity or four black men near Room 111 on the day of the murder. He did send an investigator to look at the locked adjoining room door, but she was unable to "tinker with it," and he did not recall if he investigated whether someone was in Room 110.

¶ 31    Justic further testified that he discussed the discovery and evidence with defendant multiple times and discussed a guilty plea but did not recall a firm offer from the State. Justic also testified that he discussed the bloody shirt with defendant and that his trial strategy was to argue that there should have been a lot of blood and not just little specks. He did not secure an expert to review the results of the blood testing because the results did not "come back to defendant" which fit with his strategy that the hotel room had no evidence to implicate defendant. Regarding Rachel, Justic's strategy was to attack her credibility and he discussed her statement that defendant called her with defendant. He did not find it necessary to subpoena Rachel's phone records and did not recall defendant denying that he called her.

¶ 32    At the close of the hearing, the trial court granted defendant's motion for new trial noting that the video evidence was "crucial" because there was no eyewitness or confession, and concluded that trial counsel was ineffective.

¶ 33    The State filed a motion for reconsideration of the order granting a new trial arguing that defendant failed to establish prejudice as required by *Strickland* and offered only speculation. There was a new attorney present for defendant at the hearing on the State's motion as Duchatellier had since retired; defendant informed the court that he had issues with Duchatellier also. On April 4, 2019, the trial court granted the State's motion to reconsider, finding that defendant failed to show actual prejudice.

¶ 34                        2. Subsequent Posttrial Proceedings

¶ 35    The supervising public defender subsequently assigned defendant's case to herself; however, on July 17, 2019, defendant told the trial court that he wanted to represent himself and made allegations that Duchatellier was ineffective. The trial court admonished him again under

Rule 401 (eff. July 1, 1984). On October 10, 2019, defendant filed a *Krankel* motion, and a preliminary inquiry was held on December 6, 2019, at which time the trial court found that defendant's allegations had no merit.

¶ 36    On January 16, 2020, defendant requested an attorney for sentencing; the trial court indicated that it was reappointing the public defender for the last time as defendant had fired or complained about every attorney that had been appointed for him. Defendant's case was assigned to supervising APD Jack Verges on February 10, 2020. However, due to the COVID-19 pandemic, there were several continuances. APD Verges also used that time to investigate mitigation evidence. On August 12, 2021, the date of the sentencing hearing, defendant told the trial court that he wanted to put mitigating facts in a motion, but that APD Verges told him it would have to be done *pro se*. APD Verges clarified to the trial court that defendant wanted to present *Krankel* evidence that was irrelevant to sentencing and further that defendant refused to speak to him. Defendant informed the court that he wished to proceed *pro se*. The trial court found that defendant was delaying sentencing and that sentencing had been pending for four years. Defendant again stated that he wished to proceed *pro se*, and the trial court held the sentencing hearing. Defendant was not re-admonished under Rule 401 (eff. July 1, 1984). The trial court subsequently sentenced defendant to 62 years' imprisonment.

¶ 37    Defendant's petition for leave to appeal was filed in this court on February 7, 2022, and granted on February 16, 2022.

¶ 38                                    ANALYSIS

¶ 39    As stated above, defendant contends on appeal that: (1) trial counsel was ineffective for failing to (a) request an adverse inference jury instruction, (b) cross-examine Detective Weeden

about more than nine hours of missing video footage that he chose not to preserve, and (c) visit or consult with defendant before trial about his case; (2) the trial court erred in (a) preventing defendant from impeaching Rachel with her misdemeanor false report to 911 conviction, (b) allowing the State to tell the jury that justice demanded a guilty verdict during closing argument which improperly inflamed the jury's passions, and (c) these errors were not harmless beyond a reasonable doubt; and (3) defendant is entitled to a new sentencing hearing because the trial court failed to re-admonish him pursuant to Supreme Court Rule 401 when he opted to proceed *pro se* at his sentencing hearing. We will examine each of defendant's issues in turn.

¶ 40                              A. Ineffective Assistance of Counsel

¶ 41    Defendant first contends that his trial counsel was ineffective for various reasons, namely that counsel failed to: request an adverse inference jury instruction, cross-examine Detective Weeden about more than nine hours of missing video footage that he "chose" not to preserve, and visit or consult with defendant about his case before trial. Defendant's allegations of trial counsel's ineffectiveness were the subject of his posttrial motion for new trial and the State's motion to reconsider. As stated above, after the jury verdict, the trial court initially granted defendant's posttrial motion for a new trial based on ineffective assistance of counsel. The State filed a motion to reconsider, arguing that defendant failed to establish prejudice and offered only speculation. The trial court granted the State's motion, finding that defendant had not established prejudice and reinstated the jury's verdict.

¶ 42    As a preliminary matter, we note that a court in a criminal case has inherent power to reconsider and correct its own rulings, even in the absence of a statute or rule granting it such authority. *People v. Mink*, 141 Ill. 2d 163, 171 (1990). A court's power to reconsider and correct

its decisions extends to interlocutory as well as final judgments. *Id.* In the case at bar, the trial court granted defendant's motion for a new trial after a jury returned guilty verdicts, which was not a final judgment of acquittal. Such order was interlocutory in nature. See *id.* The court set the matter for a new trial and retained jurisdiction of defendant and the indictment. See *id.* The State subsequently filed a motion to reconsider the grant of defendant's motion for a new trial, which the trial court granted and reinstated defendant's convictions. As long as the case was pending before it, the trial court had jurisdiction to reconsider any order which had previously been entered. *Id.*

¶ 43    Nor does the double jeopardy clause preclude the trial court from reconsidering and vacating the order granting defendant a new trial. *Id.* at 178. As stated, the jury returned verdicts finding defendant guilty of the charged offenses. The trial court entered a post-verdict ruling granting defendant a new trial. Although reconsideration of that ruling likely subjected defendant to continuing anxiety, it did not expose him to the possibility of a second trial on the merits. Rather, when the trial court determined that the new trial order was improper, it simply vacated that order and reinstated the jury's verdict.

¶ 44    Turning to defendant's argument on appeal, he is essentially arguing that the trial court erred in granting the State's motion to reconsider the new trial order based on his allegations of trial counsel's ineffectiveness.  The purpose of a motion to reconsider is to bring to the trial court's attention changes in the law, errors in the court's previous application of the existing law, and newly discovered evidence not available at the time of the hearing. *People v. Arze*, 2016 IL App (1st) 131959, ¶ 85. Public policy favors correcting errors at the trial level, and a timely motion to reconsider is an appropriate method to direct the trial court's attention to a claim of error. *Id.* When

reviewing a motion to reconsider that was based only on the trial court's application (or purported misapplication) of existing law, as opposed to one based on new facts or legal theories not presented in the prior proceedings, our standard of review is *de novo*. *Id.*

¶ 45    In this case, the trial court granted the motion to reconsider based on its ruling that defendant's trial counsel was ineffective. To prevail on a claim of ineffective assistance of counsel, the defendant must satisfy the two-part test established in *Strickland v. Washington*, 466 U.S. 668 (1984) as adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504, 525 (1984). A defendant must establish both that trial counsel's performance was objectively unreasonable under prevailing professional norms and a reasonable probability that, but for the unprofessional performance, the outcome would have been different. *People v. Boyd*, 2021 IL App (1st) 182584, ¶ 55. To establish deficient representation, defendant must overcome the strong presumption that the challenged inaction might have been the result of sound trial strategy. *Id.* To establish prejudice, defendant must show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. *Id.* If a claim can be disposed of based on prejudice, the trial court need not consider whether counsel's performance was deficient. *Id.* We review claims of ineffective assistance of counsel *de novo*. *People v. Johnson*, 2021 IL 126291, ¶ 52.

¶ 46    Here, the trial court determined on the motion to reconsider that defendant failed to meet the prejudice prong of *Strickland*. Under that prong, an error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. *Strickland*, 466 U.S. at 691; *Johson*, 2021 IL 126291, ¶ 54. The question is not whether a court can be certain that counsel's performance had no effect on the outcome or

whether it is possible a reasonable doubt might have been established if counsel acted differently. *Johnson*, 2021 IL 126291, ¶ 54. Instead, *Strickland* asks whether it's reasonably likely the result would have been different. *Id.* A reasonable probability that, but for counsel's errors, the result of the proceeding would have been different is a probability sufficient to undermine confidence in the outcome. *Id.* Moreover, *Strickland* requires a defendant to affirmatively prove that prejudice resulted from counsel's errors. *Id.* ¶ 55. It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. *Id.* Satisfying the prejudice prong necessitates a showing of actual prejudice, not simply speculation that defendant may have been prejudiced. *Id.*; *People v. Patterson*, 2014 IL 115102, ¶ 81; *People v. Palmer*, 162 Ill. 2d 465, 481 (1994).

¶ 47 In the case at bar, defendant's *pro se* allegations of ineffective assistance resulted in a preliminary *Krankel* hearing after which the trial court appointed APD Duchatellier to represent defendant. APD Duchatellier filed defendant's motion for new trial alleging ineffective assistance of trial counsel. A review of defendant's motion for new trial reveals that it only argued that trial counsel's failure to conduct a reasonable investigation could be considered ineffective because in advocating for defendant, trial counsel had a duty to reasonably investigate the case. Additionally, the motion argued that the failure to hire a forensic video surveillance expert and the failure to present the time discrepancy evidence to the jury could not be considered strategic decisions. Defendant's motion made no argument or showing as to the prejudice prong of *Strickland*.

¶ 48 However, on appeal, for the first time, defendant argues that trial counsel was ineffective for failing to request an adverse inference instruction, Illinois Pattern Jury Instruction, Civil, 5.01 (IPI Civil (2011) 5.01), based on the State's failure to produce the full unedited video at trial, and

argues in passing that Duchatellier was ineffective for not including this argument in the posttrial motion. Defendant also argues on appeal that counsel's failure to consult with him shows a dereliction of "one of the core duties of an attorney." With respect to prejudice, defendant contends that because the evidence against him was not overwhelming, *Strickland* prejudice is "obvious." Defendant also speculates that because the "missing" portion of the video included the time when Gloria's body was discovered by the motel staff, it would have been "entirely appropriate" for the jury to conclude that the missing portion of the video showed someone other than defendant entering Room 111 and the prejudice is clear from trial counsel's inaction. Further, defendant argues that trial counsel's failure to cross-examine Weeden was highly prejudicial; counsel's failure to question the deficiencies in the surveillance video "undercuts any confidence in the outcome below." Defendant also notes that Duchatellier was denied the opportunity to hire an expert to examine the videos to determine whether they were altered before trial, which was unfair as the State argued on its motion to reconsider that no witness was offered to testify about missing footage or potential tampering. Defendant concludes that there is a reasonable probability that the result of the proceeding would have been different if trial counsel was not deficient.

¶ 49    We disagree with defendant's characterization of the evidence presented at trial. The record makes clear that the State presented several types of evidence at trial: testimonial evidence from the motel staff, police officers, Gloria's mother, Ieshia (the mother of some of defendant's children with whom he lived at the time of the murder) and Rachel (the mother of others of defendant's children with whom he spent the weekend of the murder with). The State also presented DNA evidence, and physical evidence recovered from Room 111 and the truck that defendant was driving that weekend. Further, the State presented video surveillance footage which supported the

testimony presented. Trial counsel testified at the *Krankel* hearing that he viewed the videos in their entirety and found no evidence of tampering. Counsel also testified to his strategy, which was to attack what the video footage did not show and to focus on the lack of direct evidence implicating defendant. Counsel's decision not to cross-examine Weedon about the edited video clips were apparently a strategic decision based on counsel's strategy for the defense. It is well-settled that matters of trial strategy are generally immune from claims of ineffective assistance of counsel. *People v. Manning*, 241 Ill. 2d 319, 327 (2011). Nor has defendant shown prejudice-namely that there is a reasonable probability that the result of his trial would have been different if trial counsel had met with him more or cross-examined Weeden. Although the State's evidence at trial was largely circumstantial, it is well recognized that a criminal conviction may be based solely on circumstantial evidence. *People v. Johnson*, 2018 IL App (1st) 150209, ¶ 19. Circumstantial evidence is proof of facts or circumstances that give rise to reasonable inferences of other facts that tend to establish guilt or innocence of the defendant. *Id.* Circumstantial evidence is sufficient to support a criminal conviction, provided that such evidence satisfies proof beyond a reasonable doubt of the elements of the crime charged. *Id.* The jury need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. *Id.*

¶ 50 Here, a review of the evidence presented shows that it supported reasonable inferences of other facts that tended to establish defendant's guilt and it satisfied the elements of the crime charged. Even if counsel provided deficient performance in not meeting with defendant often or failing to cross-examine Weeden, the trial court properly concluded that defendant's ineffective assistance of counsel claim fails because defendant has not established prejudice.

¶ 51    The same conclusion applies to defendant's argument that trial counsel was ineffective for failing to request IPI Civil 5.01 and that *Krankel* counsel was deficient for failing to raise this issue in the posttrial motion. Specifically, counsel was not deficient, and defendant cannot establish prejudice. Decisions concerning defense counsel's choice of jury instructions are characterized as tactical decisions with the judgment of defense counsel, and trial strategy cannot be the basis for finding counsel ineffective. *People v. Clarke*, 391 Ill. App. 3d 596, 617 (2009).

¶ 52    Defendant argues however that IPI Civil 5.01 is appropriate in criminal cases and cites several cases in support of his argument. We disagree that it is appropriate in this case.

¶ 53    IPI Civil 5.01 provides, in pertinent part, that if a party fails to offer evidence within its power to produce, jurors may infer that the evidence would be adverse to the party if the jurors believe (1) the evidence was under the control of the party and could have been produced by the exercise of reasonable diligence, (2) the evidence was not equally available to an adverse party, (3) a reasonably prudent person under the same or similar circumstances would have offered the evidence if he believed the evidence to be favorable to him, and (4) no reasonable excuse for the failure has been shown.

¶ 54    We note that there is no comparable missing evidence instruction in the criminal jury instructions. This court has previously found that IPI Civil 5.01 was made for use in civil cases, and its use in criminal cases could result in plain error since it clearly could be interpreted to conflict with a defendant's fifth amendment right to remain silent. *People v. Blackwood*, 2019 IL App (3d) 160161, ¶ 21; *People v. Hall*, 235 Ill. App. 3d 418, 430 (1992). If IPI Civil 5.01 was tendered in a criminal case, comments on missing evidence may violate defendant's presumption of innocence by the jury possibly imposing a burden of proof on the defendant to present evidence

when a criminal defendant has no burden to produce any evidence. However, we also note that in the limited instances where IPI Civil 5.01 has been given in a criminal case on defendant's request, it was given in the context of imposing discovery sanctions against the State. *Blackwood*, 2019 IL App (3d) 160161, ¶ 22. That is not the case here. Weconclude therefore that defendant cannot establish prejudice from trial counsel's failure to request IPI Civil 5.01.

¶ 55 Accordingly, we find that the trial court properly granted the State's motion to reconsider as defendant has not established how he was prejudiced by trial counsel's alleged errors.

¶ 56 B. Trial Court Errors

¶ 57 Defendant next contends that the trial court erred in preventing his trial counsel from impeaching Rachel about a crime of dishonesty and erred in allowing the State to argue to the jury that justice demanded a guilty verdict. He asserts that the trial court erred in denying his motion for new trial based on these errors and he is entitled to a new trial because the State cannot demonstrate that the errors are harmless beyond a reasonable doubt. We review a trial court's denial of a motion for new trial for abuse of discretion. *People v. Carter*, 2022 IL App (1st) 210261, ¶ 129.

¶ 58 1. Excluded Impeachment Evidence

¶ 59 Defendant first contends that the trial court erred in preventing him from impeaching Rachel with her false report to 911 conviction. He argues that the evidentiary rules allow a witness' credibility to be challenged by a conviction for false statement involving dishonesty, unless the trial court finds the probative value is outweighed by the danger of undue prejudice. He also notes that the State misinformed the trial court of the status of Rachel's misdemeanor false report to 911 case as her supervision in that case was revoked on June 8, 2012, and she was resentenced to six

days in jail. He contends that the revocation of Rachel's supervision resulted in a conviction, and she could be impeached by it since it occurred within 10 years of her testimony and was also a crime of dishonesty and provided computer printouts of Rachel's case information to support his contention. Defendant acknowledges that this new information was not provided to the trial court when it excluded the evidence for impeachment purposes and thus was not included in the motion for new trial nor was the trial court's ruling based on it. Additionally, he asks this court to take judicial notice of the case information related to Rachel's prior conviction that he provided in the appendix to his brief.

¶ 60 Generally, in order to preserve an issue concerning the trial court's preclusion of impeaching evidence at trial, the defendant must set forth an offer of proof at trial to establish on the record, for purposes of review, that the evidence he sought to introduce was positive and direct on the issue of bias or motive to testify falsely. *People v. Wallace*, 331 Ill. App. 3d 822, 831 (2002). Although formal offers of proof are generally required to preserve the issue of whether preclusion of the evidence was proper, an informal offer of proof, where counsel merely summarizes what the proposed evidence or testimony may show, may be sufficient to preserve the claim of error if it is specific enough in nature and if it is not based merely on speculation or conjecture. *Id.* An offer of proof is sufficiently specific, therefore, if it adequately shows the court what the evidence would be, allowing a court of review to assess the prejudice allegedly stemming from the exclusion. *Id.* The failure to make such an offer results in forfeiture of the issue. *People v. Staake*, 2017 IL 121755, ¶ 51.

¶ 61 Our review of the record reveals that there was a sidebar outside of the presence of the jury after the State objected to defense counsel's attempt to question Rachel about her previous

convictions. Defense counsel mentioned Rachel's previous cases to the trial court during the sidebar but did not make any offer of proof, such as copies of the convictions, to support the argument that they were admissible as impeachment evidence. This issue was however, included in trial counsel's motion for new trial. We find that this issue was not properly preserved as counsel did not make an offer of proof, formal or informal, that would have shown the court what the evidence would be: thus, it is forfeited. See *People v. Lesley*, 2018 IL 122100, ¶ 37 (forfeiture is defined as the failure to make the timely assertion of the right and results in the loss of a right regardless of the defendant's knowledge thereof and irrespective of whether the defendant intended to relinquish the right).

¶ 62    Appellate counsel attempts to correct the forfeiture by asking this court to take judicial notice of Rachel's prior conviction that counsel sought to use for impeachment purposes and find that it was improperly excluded.[1] A reviewing court may take judicial notice of matters not previously presented to the trial court when the matters are capable of instant and unquestionable demonstration. *People v. Boykin*, 2013 IL App (1st) 112696, ¶ 9. Courts frequently take judicial notice of public documents, including records from the Illinois Department of Corrections (IDOC). *People v. Castillo*, 2022 IL 127894, ¶ 40.

¶ 63    The case search information appellate counsel has included in the index to defendant's brief is not an official copy of Rachel's convictions from the IDOC nor the trial court's half sheet; rather, it appears to be a computer-generated document from the trial court's website as a result of a public document search. Counsel offers no explanation as to why he did not secure a copy of

---

[1] It is unclear whether counsel is attempting to invoke application of the plain error doctrine as such request is not explicitly stated in defendant's brief.

Rachel's IDOC records. Nevertheless, we will take judicial notice of the information provided as it meets the qualifications for information that is "capable of instant and unquestionable demonstration." *Boykin*, 2013 IL App (1st) 112696, ¶ 9.

¶ 64 We next determine whether Rachel's prior conviction qualified as proper impeachment evidence of a crime of dishonesty. Under Illinois Rules of Evidence 609(a) (eff. Jan. 1, 2011), which governs the impeachment of a witness with a prior criminal conviction:

"[E]vidence that a witness has been convicted of a crime, except on a plea of *nolo contendere*, is admissible but only if the crime, (1) was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, or (2) involved dishonesty or false statement regardless of the punishment unless (3), in either case, the court determines that the probative value of the evidence of the crime is substantially outweighed by the danger of unfair prejudice."

¶ 65 The terms dishonesty and false statement refer to crimes such as perjury, persuading one to commit perjury, false statement, criminal fraud, embezzlement, false pretenses, other offenses of "*crimen falsi*," and theft. *People v. Atkinson*, 186 Ill. 2d 450, 465 (1999). Our supreme court has held that any misdemeanor which has as its basis lying, cheating, deceiving or stealing bears a reasonable relation to testimonial deceit and should be admissible for impeachment purposes. *People v. Spates*, 77 Ill. 2d 193, 204 (1979). In making this determination, the facts surrounding the prior conviction are not to be looked at and only the crime as defined by statute should be considered. *People v. Mullins*, 242 Ill. 2d 1, 15-16 (2011).

¶ 66 Here, according to the documentation included in defendant's brief that this court is asked to take judicial notice of, the prior conviction at issue from 2011 indicates a false report to 911,

and the statute cited is 720 ILCS 5/26-1(A)(12) (West 2010), which is defined as disorderly conduct. The 2011 version of subsection 1(A)(12) states that a person is guilty of disorderly conduct when he or she knowingly:

> "[c]alls the number '911' for the purpose of making or transmitting a false alarm or complaint and reporting information when at the time the call or transmission is made, the person knows there is no reasonable ground for making the call or transmission and further knows that the call or transmission could result in the emergency response of any public safety agency." 720 ILCS 5/26-1(A)(12) (West 2010).[2]

¶ 67    We therefore find that Rachel's prior conviction was a crime involving a false statement and could have served as impeachment evidence. However, as previously noted, this information was not provided to the trial court when it made its ruling, thus we cannot say that the trial court erred in excluding this evidence based on the information it had at the time. Moreover, because trial counsel failed to make an offer of proof of this evidence to the trial court, we find that counsel's performance was deficient as it relates to this issue.

¶ 68    Irrespective of that finding, we conclude however that defendant was not prejudiced by the exclusion of this evidence because it was merely cumulative of the evidence of Rachel's prior convictions that was already provided to the jury at trial. As previously noted, at trial, Rachel admitted to her previous convictions for retail theft in 2007 and 2013; delivery of a controlled substance in 2008; and possession of a counterfeit credit card in 2013. Three of those convictions were crimes of theft or false statement for purposes of impeachment, so the admission of the

---

[2] The version of the disorderly conduct statute that Rachel was convicted under was in effect between January 1, 2011, and June 27, 2011.

misdemeanor false 911 report would have merely been cumulative of the evidence that was admitted. Nor has defendant shown that there is a reasonable probability that the admission of the false 911 report would have changed the result of his trial. See *Strickland*, 466 U.S. at 694; *People v. Mitchell*, 238 Ill. App. 3d 1055, 1065 (1992). We therefore conclude that trial counsel was not ineffective for failing to make an offer of proof of Rachel's false 911 report conviction because defendant was not prejudiced by counsel's failure to have the information admitted.

¶ 69                                   2. Improper Closing Argument by the State

¶ 70    We next examine defendant's claim that the trial court erred in allowing the State to make an improper closing argument. Specifically, he contends that the State's argument that justice demanded a guilty verdict was solely meant to inflame the jury's passions. Defense counsel's objection to the statements was overruled and it was included in trial counsel's original motion for new trial, thus it was properly preserved for review.

¶ 71    The purpose of closing arguments is to give parties a final opportunity to review with the jury the admitted evidence, discuss what it means, apply the applicable law to that evidence, and argue why the evidence and law compel a favorable verdict. *People v. Green*, 2017 IL App (1st) 152513, ¶ 77. A defendant faces a substantial burden in attempting to achieve reversal of his conviction based on improper remarks made during closing argument. *Id.* Prosecutors are afforded wide latitude in closing argument; on appeal the reviewing court determines whether or not the comments made at closing argument substantially prejudiced the defendant such that it is impossible to say whether or not a guilty verdict resulted from them. *People v. Scott*, 2015 IL App (1st) 131503, ¶ 44. The State is entitled to argue all reasonable inferences from the evidence, it

may discuss the witnesses and their testimony, and it may assume the truth of the State's evidence. *Green*, 2017 IL App (1st) 152513, ¶ 77.

¶ 72    It is improper for the State to do or say anything in argument where the only effect of which will be to inflame the passion or arouse the prejudice of the jury against the defendant, without throwing any light on the question for decision. *Id.* It is also improper when the remarks misstate the evidence or argue facts not in evidence. *Id*. Improper comments during closing argument can constitute reversible error only when they "engender substantial prejudice against defendant such that it is impossible to say whether or not a verdict of guilty resulted from those comments." *Id*. (citing *People v. Moore*, 358 Ill. App. 3d 683, 693 (2005). We view the closing arguments of both the State and defense counsel as a whole for context rather than focus on particular phrases or remarks. *Scott*, 2015 IL App (1st) 131503, ¶ 44. To warrant reversal and a new trial, the improper remarks in closing argument must constitute a material factor in defendant's conviction. *Id.*

¶ 73    There remains a split of authority on whether the appropriate standard of review is abuse of discretion or *de novo*. *Green*, 2017 IL App (1st) 152513, ¶¶ 78-80. However, as several courts before us have found, we need not resolve the issue of the appropriate standard of review at this time because our decision in this case would be the same under either standard. See *id*. ¶ 81.

¶ 74    Here, defendant contends that the State's comment during closing argument that "justice demands a guilty verdict" was improper and only served to inflame the jury's passion. We disagree. The State may comment unfavorably on the evil effects of the crime and urge the jury to administer the law without fear when such argument is based on competent and pertinent evidence. *People v. Woods*, 2011 IL App (1st) 091959, ¶ 42. Moreover, although the State's remarks may sometimes exceed the bounds of proper comment, the verdict must not be disturbed unless it can

be said that the remarks resulted in substantial prejudice to the defendant, and that absent such remarks, the verdict would have been different. *Id*. In other words, the comments must have been a material factor in convicting the defendant. *Id.* Additionally, a significant factor in reviewing the impact of the State's allegedly improper comments on a jury verdict is whether the comments were isolated and brief within the context of a lengthy closing argument. *Id*.

¶ 75    Moreover, even if the State's comments were improper and constituted error, the trial court may correct the error through proper jury instructions. *Green*, 2017 IL App (1st) 152513, ¶ 98. Improper arguments can be corrected by proper jury instructions, which carry more weight than the arguments of counsel. *Id.* Any possible prejudicial impact is greatly diminished by the trial court's instruction that closing arguments are not evidence and such instruction protects the defendant against any prejudice caused by improper comments made during closing arguments as it is presumed that jurors follow the instructions provided by the trial court. *Id.*

¶ 76    Upon review of the State's full closing argument, we cannot say that the State committed clear or obvious error in its remarks during closing argument. We note that the State's closing argument spanned 15 pages of the transcript, and these are the only comments that defendant complains of. Further, the complained-of comments were brief and isolated as they were the very last two statements made by the State as it closed its argument. The majority of the State's closing argument focused on the evidence presented at trial, the severity of the crime, and justice for Gloria. The State's comments were not to inflame the jury's passions but rather were comments based on its inference from the evidence presented at the trial and to enter a jury verdict since that is what the evidence and justice demanded. Such comments are not improper. See *People v James*, 2021 IL App (1st) 180509, ¶ 41. On review of the State's and defense counsel's closing arguments

as well as rebuttal argument, we cannot say that these brief comments at the end of the State's closing argument materially affected the jury's verdict and defendant makes no real argument that the outcome of the trial would have been different if the State had not made the comments.

¶ 77    Additionally, prior to the beginning of closing arguments, the trial court admonished the jury that "[w]hat the lawyers say is not evidence and should not be considered by you as evidence. The lawyers will simply be discussing what they believe the evidence has shown." Once closing arguments were concluded, the trial court admonished the jury that it was their duty to determine the facts and to determine them only from the evidence in the case. Further, the court admonished the jury that it was to consider the evidence, which consisted only of the testimony of the witnesses and the exhibits which the court received. The trial court then admonished the jury again that closing arguments

> "are made by the attorneys to discuss the facts and circumstances in the case and should be confined to the evidence and to reasonable inferences to be drawn from the evidence. Neither opening statements nor closing arguments are evidence, and any statement or argument made by the attorneys which is not based [o]n the evidence should be disregarded."

¶ 78    As such, even if the State's comments during closing were improper, the trial court corrected any error by instructing the jury that the State's comments were not evidence and to base its verdict only on the evidence presented at trial. As a result, we find that the trial court did not err in allowing the State's comments to stand, and we affirm defendant's conviction.

¶ 79                    C. Compliance with Illinois Supreme Court Rule 401

¶ 80    Lastly, defendant contends that he is entitled to a new sentencing hearing because the trial court did not re-admonish him pursuant to Rule 401when he opted to proceed *pro se* at his original sentencing hearing. He argues that his waiver of counsel was therefore invalid, and he is entitled to a new sentencing hearing. Defendant acknowledges that he did not object to the lack of admonishments at his sentencing hearing, nor was this issue raised in a post-sentencing motion. He contends, however, that this court should review the issue under the second prong of the plain error doctrine because it is a structural error that does not require a showing of prejudice and the issue involves a fundamental right.

¶ 81    Because the right to counsel is fundamental, a reviewing court may review an alleged violation of Rule 401 (eff. July 1, 1984) under the plain error doctrine. *People v. Black*, 2011 IL App (5th) 080089, ¶ 24; *People v. Vazquez*, 2011 IL App (2d) 091155, ¶ 14; *People v. Khan*, 2021 IL App (1st) 190051, ¶ 40. The first step in determining whether plain error applies, however, is determining whether a clear or obvious error occurred. *People v. Sebby*, 2017 IL 119445, ¶ 49.

¶ 82    The state and federal constitutions grant defendants a right to counsel. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. This right applies to all critical stages of prosecution, including sentencing. *People v. Allen*, 220 Ill. App. 3d 772, 781 (1991). However, a defendant has a right to waive representation by counsel and proceed *pro se*. *People v. Haynes,* 174 Ill. 2d 204, 235 (1996). Accordingly, a defendant may waive his constitutional right to counsel as long as such waiver is knowing and voluntary. *Id.*

¶ 83    A defendant's waiver of the right to counsel must be clear and unequivocal. *People v. Khan*, 2021 IL App (1st) 190051, ¶ 43. The purpose of requiring a clear and unequivocal waiver is to (1) prevent the defendant from appealing either the denial of his right to self-representation

or the denial of his right to counsel, and (2) prevent the defendant from manipulating and abusing the system by going back and forth between his request for counsel and his wish to proceed *pro se*. *Id.* To determine whether a defendant's waiver was unequivocal, a reviewing court will look at the overall context of the proceedings, including the defendant's conduct following his request to represent himself. *Id.*; *People v. Khan*, 407 Ill. App. 3d 315, 340 (2011).

¶ 84　Illinois Supreme Court Rule 401 requires the court to complete a specific procedure before it can accept a defendant's waiver of counsel as knowing and intelligent. Under Rule 401(a), the court shall inform the defendant of and determine that the defendant understands:

> "(1) the nature of the charge;
>
> (2) the minimum and maximum sentences prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; and
>
> (3) that he has a right to counsel, and, if he is indigent, to have counsel appointed for him by the court." Ill. S. Ct. R. 401(a) (eff. July 1, 1984).

¶ 85　Our supreme court has consistently held that strict, technical compliance with Rule 401(a) is not always required. *Haynes,* 174 Ill. 2d at 236; *People v. Johnson*, 119 Ill. 2d 132 (1984). Substantial compliance is sufficient if (1) the record indicates defendant's waiver of the right to counsel was knowing and voluntary and (2) the given admonishments did not prejudice defendant's rights. *Johnson*, 119 Ill. 2d at 132. This issue requires us to determine whether the trial court has complied with a supreme court rule, which we review *de novo*. *People v. Campbell*, 224 Ill. 2d 80, 84 (2006); *People v. Ware*, 407 Ill. App. 3d 315, 341 (2011).

¶ 86    Here, the record reveals that this was defendant's third time electing to proceed *pro se* during the proceedings, each instance occurring after defendant's jury trial. Neither party claims that the trial court strictly complied with Rule 401. Defendant admits that he was fully admonished under Rule 401 the first two times but contends that he should have been re-admonished prior to proceeding *pro se* at the sentencing hearing. He, first, elected to proceed *pro se* on his motion for new trial and the trial court fully admonished defendant on January 10, 2017. Defendant represented himself for almost nine months until the trial court appointed counsel to represent him during the *Krankel* proceedings. After the State's motion to reconsider was granted and his conviction reinstated, defendant again elected to proceed *pro se* on July 17, 2019, and he was fully admonished by the trial court. He represented himself until December 6, 2019, when the trial court denied his request for new *Krankel* counsel. New counsel was appointed on January 27, 2020, for sentencing but the case was subsequently delayed during the COVID-19 pandemic court closures and counsel's preparation time. On August 12, 2021, defendant requested to represent himself during sentencing and the trial court did not re-admonish him under Rule 401 before allowing him to proceed *pro se*. Thus, it is clear that the trial court failed to strictly comply with Rule 401(a).

¶ 87    However, a lapse in time between the trial court providing Rule 401(a) admonishments and the defendant's waiver does not *per se* invalidate defendant's waiver. *Haynes*, 174 Ill. 2d at 242. Rather, each case must be assessed on its own facts. *Id.* Under the continuing waiver rule, a defendant can waive the right to counsel and that waiver stays in place throughout the remaining stages. *People v. Martin*, 2021 IL App (4th) 180267, ¶ 33. However, that rule is subject to two exceptions: (1) when the defendant later requests counsel or (2) other circumstances suggest that the waiver is limited to a particular stage in the proceedings. *Id.*

¶ 88    Here, it is clear that defendant switched three times in posttrial proceedings between having counsel and going *pro se*, thus requiring three sets of admonishments. The instance at issue occurred just before the sentencing hearing, meaning that defendant received no admonishments regarding the nature of the charge or the possible penalties and defendant's right to have counsel under Rule 401(a). Thus, there was never an admonishment at a separate, critical stage of the proceedings. *Martin*, 2021 IL App (4th) 180267, ¶ 35; *People v. Burton*, 184 Ill. 2d 1, 22 (1998). We cannot find that the trial court substantially complied with Rule 401(a) under these circumstances and conclude that it was error not to admonish defendant before the sentencing hearing.

¶ 89    We are sympathetic to the circumstances presented to the trial court in this case, where the trial concluded four years prior to the sentencing, defendant vacillated between wanting counsel and representing himself, and the trial court may have been genuinely frustrated by the lengthy delays in the case, and the fact that defendant was fully admonished on two prior occasions during different stages of the posttrial proceedings. Additionally, while it is doubtful that the repetition of Rule 401(a) admonishments would have had a significant impact on defendant's decision to waive counsel, that is not the proper analysis where, as here, prejudice is presumed because of the importance of the right involved. *Martin*, 2021 IL App (4th) 180267, ¶ 36; *People v. Fort*, 2017 IL 118966, ¶ 18. Rule 401(a) admonishments must be provided where a defendant waives counsel, proceeds *pro se*, requests counsel for a different stage of the proceedings, receives counsel, and then decides to waive counsel again. *People v. Washington*, 2016 IL App (1st) 131198, ¶ 60. Because the trial court failed to do so, we are unable to conclude that defendant provided a knowing

and voluntary waiver of counsel and therefore this cause must be remanded for a new sentencing hearing.

¶ 90                                    CONCLUSION

¶ 91    In conclusion, we find that the trial court properly granted the State's motion to reconsider because defendant failed to establish that he was prejudiced by his trial counsel's alleged ineffective representation. We also find that the trial court did not err in excluding evidence of Rachel's prior misdemeanor conviction for false 911 report where the case information was not presented to the trial court at the time the decision was made, and that trial counsel was not ineffective for failing to present the case information when it was cumulative to the evidence presented to the jury about Rachel's other prior convictions. Additionally, the trial court did not err in overruling trial counsel's objection to the State's closing arguments where the complained-of comments were not proper comments on the evidence and any error was harmless as defendant has not shown how the result of the trial would have been different if the comments were excluded. Accordingly, we affirm defendant's convictions. However, we vacate defendant's sentence and remand for a new sentencing hearing because the trial court failed to substantially comply with Rule 401(a) when it did not re-admonish defendant before allowing him to proceed *pro se* at the sentencing hearing.

¶ 92    Affirmed in part; reversed in part.